# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

J & W Corporation of Greenwood, Appellant,

v.

Broad Creek Marina of Hilton Head, LLC; Broad Creek Marina Operations, LLC; Broad Creek Marina Properties, LLC; Broad Creek Marina and Development, LLC, Respondents.

Appellate Case No. 2020-000862

---

Appeal from Beaufort County
Marvin H. Dukes, III, Master-in-Equity

---

Opinion No. 6035
Heard May 4, 2023 – Filed November 15, 2023

---

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

---

Thomas Calvin Taylor, of Law Offices of Thomas C. Taylor, LLC, of Bluffton, for Appellant.

Ellis Reed-Hill Lesemann and Michelle Alyce Stewart, both of Lesemann & Associates LLC, of Charleston, for Respondents.

---

**GEATHERS, J.:** In this action, Appellant J & W Corporation of Greenwood (J&W) appeals an order of Master-in-Equity resolving a dispute between J&W and Respondents Broad Creek Marina of Hilton Head, LLC; Broad Creek Marina Operations, LLC; Broad Creek Marina Properties, LLC; and Broad Creek Marina

and Development, LLC (collectively, "Broad Creek Marina").  J&W argues that the master's errors include: (1) declining to issue a declaratory judgment for J&W in a dispute over the use of a boat shed for J&W's office; (2) ordering J&W to accept an Aqua Lodge houseboat as a "Floating Office"; (3) declining to award J&W nominal damages for breach of contract; (4) declining to apply an equitable setoff to the damages awarded to Broad Creek Marina because of the dispute over the boat shed-office; (5) awarding damages and pre-judgment interest to Broad Creek Marina for hurricane-related damage to some of the marina's docks; (6) declining to issue a judgment declaring that a settlement agreement between the parties shifted responsibility for dock damages and insurance coverage to Broad Creek Marina; and (7) quashing a trial subpoena and awarding certain damages despite the subpoenaed evidence's relevance to those damages.  We affirm in part, reverse in part, and remand for the entry of a judgment in compliance with this opinion.

## FACTS/PROCEDURAL HISTORY

This case involves events that have taken place over a period of more than thirty years.  It revolves almost entirely around a marina in Beaufort County and a barge service at the marina.  The bitter disputes between the parties require us to go into some detail about how the two sides ended up before this court.

### A.  Setting Up Broad Creek Marina

In the early 1980s, William "Wick" Scurry (Scurry) and his father bought the Broad Creek Marina[1] in Beaufort County.  During the Scurrys' ownership of the marina, the younger Scurry and a customer built a boat shed that would become more significant to Scurry's life than perhaps he imagined.  Eventually, the Broad Creek Marina was sold to a man named Frank Ferrari, but Ferrari's fortunes reversed, and his lender asked Scurry to return to manage the marina.[2]  In return for his agreement to do so, Scurry received a right of first refusal to purchase the property.

In 1993, Richard Freedman, a principal of Hilton Head Island Marina, L.P., which later became known as Broad Creek Marina of Hilton Head, LLC, became interested in buying the marina. Scurry's company—J&W, which operated a ferry

---

[1] For clarity, we will preface "Broad Creek Marina" with "the" when referring to the property itself versus the collective Respondents.

[2] Scurry's testimony is not always clear on when these events occurred.  He candidly testified that he did not remember precisely when Ferrari bought the marina.

and barge service from the marina to Daufuskie Island—exercised its right of first refusal. J&W then assigned the purchase contract to Richard's business.[3]

On September 23, 1993, the two parties signed an agreement (the Lease). It was a 99-year lease under which J&W would pay $1 a year in "Base Rent." Other various expenses that could be attributed to J&W's presence at the marina—its utilities, the portion of the tax bill covering the leasehold, and the share of Broad Creek Marina's insurance costs attributable to the leasehold—would be paid in "Additional Rent."

Among the provisions of the lease was one labeled "Liability Insurance." Under that provision, J&W was required to carry "insurance for personal property, trade fixtures and property damage as well as environmental coverage and a public liability policy." The policy had to name both J&W and Broad Creek Marina, and it had to provide at least one million dollars in coverage, with annual adjustments for inflation.

## B. Tensions Build

Over roughly the next decade, the relationship between J&W and Broad Creek Marina significantly deteriorated. Roger Freedman—Richard's brother—became J&W's primary contact.[4] Contributing to the strain was the aftermath of the sinking of J&W's floating store, which housed its operations. Scurry blamed the sinking on his own failure to maintain it well. After the sinking, J&W relocated its operations to a portion of the marina's future restaurant, which at that point served as an office.

To resolve their building grievances, and settle a lawsuit that had been filed, the two parties signed a Release and Confidential Settlement Agreement (the Settlement Agreement). The Settlement Agreement incorporated the lease and stated that "the Parties specifically reaffirm and ratify the terms and conditions of the Lease attached hereto and incorporated herein by reference, not specifically modified by the terms of this document."

The Settlement Agreement provided that J&W would receive a floating store to house its operations; that "if and only if" that was not possible, J&W would be given space in a proposed dockmaster's house to be built at the marina; and that "if

---

[3] The record does not reflect when Richard's business changed its name, but hereinafter, we will refer to the business as Broad Creek Marina.

[4] Roger Freedman indicated in a deposition read at trial that he bought out his brother's interest in the business.

and only if" neither of those solutions were possible, J&W would maintain its space at the marina office with the possibility of "relocat[ing] to a mutually agreeable location of a size, kind and quality at least comparable to the existing space, and such replacement space shall be located in the center of the commercial and retail activity at the Marina." The Settlement Agreement also provided that:

> J&W agrees to pay all common area charges as identified in the Lease that come due and payable beginning January 2005. The formula for determining amounts due and payable by the Parties for common area charges is attached as Exhibit F. [Broad Creek Marina] agrees to waive any and all previously accrued charges.
>
> . . . [Broad Creek Marina] agrees to pay for all costs related to the purchase and installation of new docks at the Marina. J&W agrees to be responsible for all costs of dock maintenance and repair for the Lease Property as contemplated in the Lease. [Broad Creek Marina] agrees to waive any and all previously accrued costs that would be due and payable by J&W as contemplated by the Lease[.] . . .
>
> . . .
>
> . . . Except as set forth, amended or modified herein, all terms and conditions of the Lease remain in full force and effect.

Exhibit F provided for J&W to pay $5,021.13 a year in additional costs. That included a share of general liability and property insurance and property tax payments, among other costs. For example, J&W was to pay 7.5 percent of the general liability insurance, for $1,657.50 annually; 32 percent of the lot maintenance costs, for $1,437.44 annually; a third of the real property insurance, for $155.76 annually; 7.5 percent of the real property insurance for docks and piers, for $155.62 annually; and a tenth of the property taxes, for $1,614.80 annually.

Around this time, Broad Creek Marina asked Scurry to "move into temporarily, a house boat"; he agreed. However, the new boat also sank. Meanwhile, the state's Office of Ocean and Coastal Resource Management (OCRM) issued permit no. 2005-1W-384-P, which

authoriz[ed] the requested dockmaster office as well as the floating office associated with the barge and ferry service. . . . The floating office will be 28' by 55' and will house the business operations associated with a transport business that transport[s] materials and equipment to and from Daufuskie Island.[5]

## C. To the Boat Shed

It was in the wake of the sinking of J&W's second waterborne office that the party's differences led to the current legal action. At some point in 2008 or 2009—accounts differ—Scurry's business was moved to the boat shed that he and the previous customer had built.[6] According to Scurry, J&W was moved into the shed around 2008, though he couldn't recall "the exact day." J&W found the settings unsatisfactory. It had no HVAC system, and resembled, in Scurry's estimation, "[s]omething like out of a Third World Country or something." There were roaches, rats, insects, and—at one point—a copperhead that Scurry discovered in his office. Scurry testified that because of the office dispute, J&W "just quit paying fees." Scurry testified that he stopped paying utilities somewhere between 2008 and 2010. He also stopped paying property insurance costs. Business records and testimony at trial indicated that as late as April 2008, J&W's account with Broad Creek Marina had a zero balance.

At least one employee of Broad Creek Marina played down the conflict over the move to the boat shed. During a deposition partially read at trial, Nate Jones—the general manager at Broad Creek Marina—recalled that he did not "remember a huge dumpster fire blowing up . . . in conversations that, you know, they would have been heated at that time if the situation was disagreeable." He testified again during trial that he did not recall the relocating of the office "being a massive problem." Roger Freedman agreed that the arrangement "was not in keeping with what [he] promised under the terms of the settlement agreement, but it was going to be temporary[.]" At the same time, Freedman testified that allowing J&W to stay in the boat shed was "generous" given the difficulties Broad Creek Marina was having with J&W.

During the trial, employees of Broad Creek Marina also disagreed with Scurry over the timing of the relocation of J&W's operations to the boat shed. Robbin

---

[5] The dockhouse was never built. Roger Freedman indicated that it was not "practical" for Broad Creek Marina and would have cost $150,000 to $200,000.

[6] The building was already housing a venture called "Water Dog Kayaking."

Rachels, the accounting manager for Broad Creek Marina, indicated that she was already working at the marina by the time J&W's operations were moved, and her employment began in February 2009. Jones, the marina's general manager, likewise said the move took place that year, and specifically in autumn.[7]

On July 6, 2010, J&W's counsel wrote a letter to Roger Freedman. Atop a lengthy list of questions and complaints was the location of J&W's office.

> Mr. Scurry has worked with you for several years patiently awaiting Broad Creek Marina's fulfillment of this lease requirement, but can wait no longer. The "temporary" quarters that have been provided are not permitted, are at variance with the Town Code, are not acceptable for business purposes and are plainly deficient under the requirements of the Lease and Settlement Agreement.

Sixteen days later—after receiving an email response from Freedman—J&W's counsel wrote in a follow-up letter that J&W wanted to "focus our joint efforts on addressing the most important issue, that of the office space for J & W."

On May 9, 2014, J&W's counsel sent a letter to counsel for Broad Creek Marina, referencing a Beaufort County action with the number 2010-CP-07-5068. In the letter, counsel maintained

> J & W's continuing contention that the damages it is suffering as a result of your client's failure to provide J & W with the office space called for under the Lease Agreement and the Settlement Agreement[] exceed the total amount of money that J & W would owe under the agreements . . . .

---

[7] At points, counsel for J&W appears to have conceded that it is at least possible that the move took place in 2009. For example, during a July 19, 2019 hearing, counsel stated that "it's undisputed that for over a ten-year period between 2009 until 2019, despite written notice to Broad Creek Marina that the office we were in was not within code and was not properly permitted[,] J&W sat in that office space for the ten years without anything new, ultimately, leading up to the trial." (We have altered the transcript to combine two sentences that were likely spoken as one.) During a February 11, 2020 hearing, counsel said "the move into the boat shed was made in about 2008 or 2009."

However, in a good-faith effort to work with Broad Creek Marina as we move into the busy summer season, J & W has instructed me to tender to Broad Creek Marina, through you as its counsel, the enclosed check . . . in the amount of $20,537.67[8] as J & W's "tax payments" for the years 2008 through 2013.

Counsel also requested documentation for other expenses.

## D. Lawsuits and Hurricanes

J&W filed an amended complaint in this action on March 28, 2016.[9] J&W asserted multiple claims, including those at issue in this appeal: breach of contract, and a declaratory judgment related to the office controversy. In its amended answer and counterclaims filed September 14, 2017, Broad Creek Marina asserted claims for breach of contract, specific performance, and negligence.

In 2016, with the legal fight underway, Hurricane Matthew threatened the South Carolina coast—and the marina. As the storm approached, Jones asked an employee of J&W to move the company's boats to avoid any damage to the docks that might result from the storm. The employee responded that J&W would not. Scurry testified that he believed his boats were "much better off where they [were] than anywhere you could put them" during a storm. He also said that there were other boats in the marina before the storm made landfall, something Jones confirmed during his testimony. The hurricane damaged some of the docks at the marina. Jones said he believed that "the fact that [J&W's] boat was tied up to that section of dock that was damaged in the storm [was] completely why that section of dock was torn up." Jones further testified that J&W's general manager acknowledged J&W's responsibility for some of the damage. However, on cross-examination, Jones conceded that he was not at the marina when Matthew struck, and that "a combination" of "wave action, wind action, and boat action" likely caused the damage.

In all, repairing damage to the marina from the storm cost Broad Creek Marina at least $54,398. Broad Creek Marina did not file a claim for the damages against

---

[8] A copy of the check is also in the record. Freedman recalled this as "a small amount of money."

[9] We have been unable to locate a precise date when the complaint in this matter was first filed. Given that the second complaint bears a caption with the number 2015-CP-07-01704, it is likely that it was filed in 2015.

its property insurance. Jones's testimony showed some confusion on his part as to whether the deductible for the losses was $40,000 or $50,000. An insurance company employee testified that the deductible for a hurricane would have been $40,000. Counsel for Broad Creek Marina also conceded at a later hearing that the deductible on the policy was $40,000.

Following the storm, on October 28, 2016, a letter on J&W letterhead was sent to Joe Gossage, an adjuster for North American Specialty Insurance Company. The letter, which went out over Scurry's signature, stated: "Under the terms of both agreements [with Broad Creek Marina], J&W is responsible for repairs to its leasehold property in the event of damage." The letter also stated:

> J & W has been advised by the General Manager of Broad Creek Marina that the docks . . . were damaged by the storm, and Broad Creek Marina is making demand upon J & W to stand ready to respond in damages. Thus, we are hereby calling upon North American Specialty Insurance Company to immediately undertake whatever investigation you deem necessary to evaluate the damage, so that you may be in a position to provide the coverage J & W purchased under its policy.

Scurry nonetheless testified at trial that he did not believe J&W was responsible for such damage. During cross-examination, Scurry said he did not recall the letter. Later, under questioning from his own counsel, he claimed to remember that the letter was part of an effort to help Broad Creek Marina.

By 2017, J&W revenues had increased over the previous seven years from $1.9 million to $3.6 million. However, Scurry testified at trial that the increase in revenues might have come from sources other than his ferry and barge operations. Scurry testified that "the [number of] people I am moving . . . out of Broad Creek[] has dropped quite a bit."

## E. Heading to Trial

In early 2019, apparently in preparation for trial, J&W's counsel subpoenaed building officials for the Town of Hilton Head. That led to the officials sending Broad Creek Marina a "Notice of Violation" regarding the boat shed and a floating building for another marina venture. The notice gave Broad Creek Marina "60 days

from the date of this letter to relocate all occupants and their belongings, and to acquire a building permit to change the occupancy of the two buildings."[10]

J&W's counsel also subpoenaed Jones and Rachels on May 8, 2019, asking both of them to produce certain documents and appear a week later. Broad Creek Marina moved to quash those subpoenas on May 10. During Rachels's testimony, the court granted the motion to quash, at least as to her subpoena.

The trial focused on the two sides' differing views of what had happened at the marina over nearly three decades—from the meanings of the Lease and the Settlement Agreement to the assorted disputes that had flared over the years. The primary issues, though, concerned J&W's office, its insurance, and which party was responsible for repairing the docks when they were damaged.

Scurry testified that J&W had "apparently" not added Broad Creek Marina to its insurance policy, as required by the Settlement Agreement. Scurry also testified that he had "never even thought about" whether he increased J&W's liability insurance for inflation, as required by the Settlement Agreement. As to whether he was required to insure the docks, Scurry said he had been told that he could not obtain insurance on the docks if they were already insured by Broad Creek Marina. Ed Barteet, who worked for Strickland Marina Insurance, said he could not remember discussing the issue with Scurry, but would have said "if you don't own the property, you can't insure it, unless there's some instrument between the landlord and the tenant that would require you to insure it."

Evidence at trial also indicated that J&W had been billed more than the dollar amount provided for on Exhibit F for at least one expense. According to a deposition read at trial, Rachels conceded that J&W's monthly share of the lot maintenance costs under Exhibit F should have been approximately $119.79, instead of the $133.12 that Broad Creek Marina had sought. Rachels explained that she "just continued billing [J&W] what was being billed when I started." Rachels gave similar testimony at trial, adding that she wanted "to point out that the [overall] lot maintenance fee of $4,492 a year has greatly increased since 2004." She also testified that, following the deposition in January, "I have not gone back and changed the amount billed each month. We have continued to bill the incorrect amount." She said she was waiting for the results of the trial before doing so. On redirect, with assistance from Broad Creek Marina's counsel, she testified that if current wage

---

[10] Christopher Yates, the building official for the town, testified that Broad Creek Marina contacted his office "[v]ery shortly" after the notice was sent. "Within a week," he added.

conditions were used to calculate the dock maintenance fee and J&W was charged the same proportion of those costs, the company would now be charged $144.21 a month. As a result, she then said she did not believe she had "wrongfully overbill[ed]" J&W.

Rachels also explained how she figured out the insurance payments that J&W owed Broad Creek Marina. Rachels said she would request a spreadsheet from Broad Creek Marina's insurance agency indicating how much of the coverage was devoted to docks and piers—of which J&W was required by the Settlement Agreement to pay 7.5 percent. Rachels conceded the spreadsheet was not included in the evidence produced by Broad Creek Marina at trial but offered to J&W's counsel, "I can get it for you." Rachels appeared to concede that during her January deposition, she had promised to provide—in the words of J&W's counsel—"the backup documentation with the policies from which we could review it."[11]

## F. Orders and Aftermath

Following the trial, the master issued an interim order dealing with the location of J&W's office on May 29. The master found he needed to address that issue quickly because of the notice of violation from the Town of Hilton Head. The master ordered a "temporary portable rental office" to be set up for J&W while Broad Creek Marina took "all reasonable steps to permit and acquire a new floating office with at least 300 square feet of commercially usable space and at least a 20-year anticipated service life" for J&W's permanent office. The master also ordered the new office to be placed at a location where it would presumably sit on the water.

J&W filed a motion to amend or alter the interim order on June 6, objecting to the suggestion in the order that J&W would have to replace the permanent floating office if and when it became unusable.

On June 28, 2019, counsel for J&W sent a letter to counsel for Broad Creek Marina alerting the latter that he had filed a motion under Rule 59(e), SCRCP, "because we do not believe that a relatively short '20-year anticipated service life' comports with the letter or spirit of what [Broad Creek Marina] is required to provide

---

[11] Counsel for J&W also contended to the master that Rachels had offered similar assistance during the January deposition. We are not sure that the deposition testimony read into the record clearly supports that. During the deposition, Rachels offered to provide some additional records, but it appears from our reading that it could have been related but different records.

J & W under the terms of the original Lease Agreement or the [Settlement Agreement]."  The Master held a hearing on July 19.[12]

Meanwhile, work on setting up a temporary office went ahead.  Jones testified at a hearing that his efforts to find a suitable temporary office consumed "two, three days [of work] total if you added all the time up plus going over there, supervising the installation, the utility installations, the permitting, et cetera."  By September 10, 2019, J&W was moving into its temporary office.  Around the same time, according to a letter from J&W's counsel, J&W once again began paying its share of the common costs of the marina.

There was also movement on the permanent replacement.  On August 10, 2019, Scurry sent Nate Jones an email rejecting the proposed office, an "Aqua Lodge."

> Unfortunately, I don't think it will work for us, for several reasons.  The fiberglass catamaran pontoons, much like the bathrooms you have on the dock, are not nearly stable enough for the movement in an office situation.  The flat roof has No pitch at all and really like a camper will eventually leak.  I called the manufacturer of the boat and he informed me the pontoons only had a limited year warranty.  As you know our settlement agreement requires a minimum of a 20[-]year life for the building[.]  I would again offer my original suggestion which is to put the building on a steel barge.

On September 26, 2019, Broad Creek Marina moved to enforce or alter the interim order and require J&W to use the Aqua Lodge as its permanent office.  It attached a statement by Dirk Wiley, the president of Catamaran Cruisers, Inc., in which he specifically disclaimed offering a guarantee of any kind,[13] but said that "when properly maintained, Aqua Lodges can remain in service for twenty (20)

---

[12] We have been unable to locate an order disposing of this motion in the record.  However, given subsequent events, we can infer that the master did not substantively alter or amend his order.

[13] Broad Creek Marina's counsel said he "wrote" some of the non-warranty language out of a fear that J&W would try to argue that a warranty was required by the Master's order.

years or longer."[14] On November 8, J&W moved for additional discovery related to the craft.

At a hearing on November 19, Jones testified about Broad Creek Marina's efforts to comply with the judge's interim order. According to Jones, the structure that Broad Creek Marina settled on for J&W's permanent office—one that sits on fiberglass pontoons—was "very sturdy." Jones also testified that the materials and design of the vessel would allow for easy, on-site maintenance, which would help the office survive for at least 20 years. And it could be relocated if a hurricane approached. Jones also said that after receiving Scurry's August 10 email, he concluded that a court order would be needed to make J&W "accept any solution."

Scurry countered in his testimony at the hearing that the new office would rock too much. He repeated his contention that what made "the most sense was to build [the office] on a steel barge." Scurry also questioned whether the structure would last for 20 years.

On November 25, 2019—in what is perhaps the first "Order on Floating Office" issued in South Carolina history—the master approved Broad Creek Marina's choice of building.

On January 9, 2020, the Master-in-Equity issued his final order and judgment in the case. As a general matter, the master found for Broad Creek Marina on the remaining issues, with the exception of its claim for negligence. The master awarded Broad Creek Marina $112,428.40. On May 4, the master denied J&W's motion to alter or amend. This appeal followed, but did not slow down the parties' legal maneuvers.

On June 17, 2020, in opposition to J&W's petition for a writ of supersedeas, Broad Creek Marina noted that J&W "has not only refused to pay the judgment, but has also refused to pay **$14,004.60** in additional charges that have come due under the Lease since the date of the trial." (Emphasis in original). As an exhibit to the motion, Broad Creek Marina enclosed a $119.79 check from J&W dated October 22, 2019, and a check in the same amount dated November 13.

---

[14] Wiley also helpfully noted in the statement that the company's "exclusive 'three deck' construction means the cabin walls are on the outside of the floor and the cabin deck is separated from both the front and rear decks . . . . The result is a sealed seamless cabin with maximum strength and weather tightness."

On April 21, 2023, this court received Broad Creek Marina's Partial Motion to Dismiss Appeal Based on Mootness. In it, Broad Creek Marina contended that a portion of J&W's argument concerning the second issue on appeal is now moot. On May 1, we received J&W's return to this motion.

## ISSUES ON APPEAL

I.     Did the master err by declining to enter a declaratory judgment for J&W based on the dispute over housing the business in the boat shed?

II.     Did the master err in ordering J&W to accept the Aqua Lodge as its "floating office"?

III.     Did the master err in not awarding J&W nominal damages on its breach of contract claim?

IV.     Did the master err in not providing an equitable setoff to J&W based on the "temporary" office assignment?

V.     Did the master err in finding that J&W was responsible for the damage to the docks and pre-judgment interest?

VI.     Did the master err by declining to issue a declaratory judgment finding that the Settlement Agreement supplemented and amended the lease agreement to shift responsibility for the insurance and the dock damage to Broad Creek Marina?

VII.     Did the master err by quashing the subpoena for Broad Creek Marina's bookkeeper and awarding a portion of the final damages?

## STANDARD OF REVIEW

Because this case involves an appeal on a combination of legal and equitable claims, our standard of review will vary with the issues. *See S.C. Dep't of Transp. v. M & T Enters. of Mt. Pleasant, LLC*, 379 S.C. 645, 654, 667 S.E.2d 7, 12 (Ct. App. 2008) ("[A] case with both legal and equitable issues presents a divided scope of review."). "When legal and equitable actions are maintained in one suit, each retains its own identity as legal or equitable for purposes of the applicable standard of review on appeal." *Consignment Sales, LLC v. Tucker Oil Co.*, 391 S.C. 266, 270, 705 S.E.2d 73, 75 (Ct. App. 2010) (quoting *Corley v. Ott,* 326 S.C. 89, 92 n.1, 485 S.E.2d 97, 99 n.1 (1997)).

In relation to any of the rulings that directly implicate a breach of either the Lease or the Settlement Agreement, this court applies the standard of review for actions at law tried without a jury because "[a]n action for breach of contract is an action at law." *Consignment Sales, LLC*, 391 S.C. at 270, 705 S.E.2d at 76 (quoting *Electro Lab of Aiken, Inc. v. Sharp Constr. Co. of Sumter, Inc.,* 357 S.C. 363, 367, 593 S.E.2d 170, 172 (Ct. App. 2004)).

> In an action at law, on appeal of a case tried without a jury, the appellate court's standard of review extends only to the correction of errors of law. The trial judge's findings of fact will not be disturbed upon appeal unless found to be without evidence which reasonably supports the judge's findings.

*Id.* at 271, 705 S.E.2d at 76 (citation omitted) (quoting *Electro Lab of Aiken, Inc.*, 357 S.C. at 367, 593 S.E.2d at 172)).

At the same time, some contractual claims are reviewed under the standard of review for equity. For example, "[a]n action for specific performance is one in equity." *Campbell v. Carr*, 361 S.C. 258, 262, 603 S.E.2d 625, 627 (Ct. App. 2004). *See also Ingram v. Kasey's Assocs.*, 340 S.C. 98, 105, 531 S.E.2d 287, 290 (2000).

> In equity actions[,] an appellate court can review the record and make findings based on its view of the preponderance of the evidence. However, this [c]ourt is not required to disregard the findings of the trial judge who saw and heard the witnesses and was in a better position to judge their credibility.

*Id.* at 105, 531 S.E.2d at 290–91 (citations omitted).

Further, our standard of review for a declaratory judgment is based on the issue raised by the request for the judgment. *See Consignment Sales, LLC*, 391 S.C. at 273–74, 705 S.E.2d at 77 ("In order to determine the appropriate standard of review to apply in an appeal from a declaratory judgment action, this court must look to the nature of the underlying action."); *see also Bundy v. Shirley*, 412 S.C. 292, 301, 772 S.E.2d 163, 168 (2015) ("Declaratory judgments are neither legal nor equitable. The standard of review for a declaratory judgment action is, therefore, determined by the nature of the underlying issue." (citations omitted)).

These distinctions must be maintained even at the finest levels of a case. *See Bundy*, 412 S.C. at 302, 772 S.E.2d at 168–69 (finding court should review the

existence of an easement under the any-evidence standard, and the "extent of a grant of an easement" under equitable standards).  As a result, we will address the standard of review in our discussion of each issue when it is necessary.

## LAW/ANALYSIS

### I.  THE BOAT SHED (J&W's Issues I, III, and IV)[15]

J&W contends the master made errors in three aspects of his order regarding the movement of its operations to the boat shed.  We take each one in turn.  In the end, we affirm on the declaratory judgment action and on equitable setoff, but reverse on the issue of nominal damages.

### A.  Declaratory Judgment

J&W argues that the master should have issued a declaratory judgment based on evidence that Broad Creek Marina "had, for at least ten (10) years, refused to provide [J&W] with a properly permitted, commercially reasonable office despite repeated demands and that [J&W] was entitled to such office space."

We find this argument is moot.  The relevant paragraph of J&W's amended complaint "seeks a declaratory judgment that . . . Broad Creek Marina must provide appropriate office space to J & W as agreed upon in the [Settlement Agreement], with a reasonable time period of no more than 90 days from this [c]ourt's order."  Based on the record before us, Broad Creek Marina has already been required to do that by the master's "Order on Floating Office."  And statements of counsel and documents filed with this court since then suggest the same.  *See* Affidavit of Ellis R. Lesemann, Esq., in Support of Respondent's Partial Motion to Dismiss Appeal Based on Mootness, at 2 ("[A] new tenant . . . has signed a [sublease with J&W] and is occupying the floating office.").[16]

> A moot case exists where a judgment rendered by the court will have no practical legal effect upon an existing controversy because an intervening event renders any grant of effectual relief impossible for the reviewing court.

---

[15] To clarify the issues, we have consolidated J&W's challenges to the master's ruling based on the factual and legal underpinnings of those claims.

[16] Lesemann's affidavit was filed in support of a motion to dismiss a different issue, but the information is still relevant to this one.

> If there is no actual controversy, this [c]ourt will not decide moot or academic questions.

*Sloan v. Friends of Hunley, Inc. (Friends I)*, 369 S.C. 20, 26, 630 S.E.2d 474, 477 (2006) (citation omitted).  Because the floating office has already been provided—and is now permitted—there is no reason for this court to order the same action as relief.

In apparent anticipation of any mootness argument, J&W contends in its brief that this court should address the issue to help the master determine which party is the prevailing party for the purposes of an award of attorney's fees.  We believe this may be a failed attempt to invoke one of the three grounds our state courts have recognized as a reason to proceed to the merits on a moot case—that "if a decision by the trial court may affect future events, or have collateral consequences for the parties, an appeal from that decision is not moot, even though the appellate court cannot give effective relief in the present case."  *Sloan v. Greenville County*, 380 S.C. 528, 535, 670 S.E.2d 663, 667 (Ct. App. 2009) (quoting *Curtis v. State*, 345 S.C. 557, 568, 549 S.E.2d 591, 596 (2001)).[17]

We see at least three reasons to decline this invitation.  First, as our courts have noted, "[t]he utilization of an exception under the mootness doctrine is flexible and discretionary pursuant to South Carolina jurisprudence, not a mechanical rule that is automatically invoked."  *Id.* at 535, 670 S.E.2d at 667.  Second, a judgment on attorney's fees is not the kind of collateral consequence that the exception contemplates.  *See* 5 Am. Jur. 2d *Appellate Review* § 561 (May 2023 update) (collecting cases).  Finally, South Carolina law provides that the master can and should take into account the *outcome* of the office issue when determining which party is the prevailing party for the purposes of attorney's fees, regardless of how that outcome was achieved.  *See Sloan v. Friends of Hunley, Inc. (Friends II)*, 393 S.C. 152, 155–59; 711 S.E.2d 895, 896–98 (2011) (holding non-profit subject to Freedom of Information Act could still be forced to pay attorney's fees when it provided requested information before the conclusion of litigation); *id.* at 157, 711 S.E.2d at 897 ("When a public body frustrates a citizen's FOIA request to the extent

---

[17] We do not believe the other two reasons most often invoked by our courts for substantively addressing a moot claim—(1) whether "the issue raised is capable of repetition but generally will evade review"  or (2) addressing "questions of imperative and manifest urgency to establish a rule for future conduct in matters of important public interest"—are at play here. *See Sloan v. Greenville County*, 380 S.C. at 535, 670 S.E.2d at 667 (listing exceptions).

that the citizen must seek relief in the courts and incur litigation costs, the public body should not be able to preclude prevailing party status to the citizen by producing the documents after litigation is filed.").[18]  Therefore, it is unnecessary to address the issue's merits for the sole purpose of determining prevailing party status.

Because this argument is moot, we will not reach the merits.

### B.    Nominal Damages for Breach of Contract

J&W argues that the master should have provided nominal damages in recognition of the time that its operations were located in the boat shed.  We agree.

Whether nominal damages should have been granted to J&W is a decision regarding the alleged breach of the Lease by Broad Creek Marina; therefore, it is an action at law.  *See Bluffton Towne Ctr., LLC v. Gilleland-Prince*, 412 S.C. 554, 562, 772 S.E.2d 882, 887 (Ct. App. 2015) ("A lease agreement is a contract, and an action to construe a contract is an action at law." (quoting *Middleton v. Eubank,* 388 S.C. 8, 14, 694 S.E.2d 31, 34 (Ct. App. 2010))).  As a result, we review it under an any-evidence standard.  "In an action at law, tried without a jury, the trial court's findings of fact will not be disturbed unless found to be without evidence which reasonably supports the court's findings."  *Duncan v. Little*, 384 S.C. 420, 425, 682 S.E.2d 788, 790 (2009) (quoting *Stanley v. Atl. Title Ins. Co.,* 377 S.C. 405, 409, 661 S.E.2d 62, 64 (2008)).  "Where a contract is unambiguous, the matter becomes one of law and the parties' intent as clearly set forth in their agreement must be given effect.  Conversely, where a contract is ambiguous, the fact finder must ascertain the parties' intentions from the evidence presented."  *Id.* at 424–25, 682 S.E.2d at 790 (citation omitted).

"The elements for breach of contract are the existence of the contract, its breach, and the damages caused by such breach."  *Branche Builders, Inc. v. Coggins*, 386 S.C. 43, 48, 686 S.E.2d 200, 202 (Ct. App. 2009).

---

[18] There are additional potential complications as to the extent of J&W's recovery, if any, under this doctrine.  *Compare Friends II*, 393 S.C. at 158–59, 711 S.E.2d at 898 (finding that court "constrained to reverse the award of fees beyond the time [the non-profit] produced the requested documents" because of previous rulings), *with Sloan v. S.C. Dep't of Revenue*, 409 S.C. 551, 555 n.5, 762 S.E.2d 687, 689 n.5 (2014) (allowing post-production fees to be awarded because of lack of similar concerns).  However, we believe those issues are properly handled in an appeal from any award of attorney's fees.

Clearly, there was a contract in the form of the Lease and the Settlement Agreement. The question here is one of breach and damages.

As to breach, we disagree with the master's decision that any office space of the required square footage was enough to meet Broad Creek Marina's obligations to J&W. Even Roger Freedman, in his testimony at trial, rejected the idea that Broad Creek Marina could have lived up to the Lease by providing a tree house to J&W. By the same logic, we do not think that Broad Creek Marina could place J&W in a dilapidated building, then require J&W to fix it up. Instead, the language requiring J&W to keep its property "in good working condition and repair, neat and clean" clearly contemplated J&W maintaining its leasehold property *after* a suitable property had been provided.

Beyond that, though, the Settlement Agreement lists three places where J&W could be relocated: (1) the floating office; (2) the dockhouse; or (3) a place mutually agreeable to the two parties. None of those conditions were met by the boat shed. There is no evidence in the record before us to support the master's finding to the contrary.[19]

Additionally, under the terms of the Lease, the fact that J&W had not paid all of the rent and other charges due to Broad Creek Marina cannot justify the decision to place J&W in a less desirable space. The Lease is clear: "Landlord shall have *no right* to eject Tenant or to terminate this Lease. Landlord's *sole remedy* shall be to obtain a money judgment against Tenant, and if the judgment remains unpaid, Landlord can execute on the same." (Emphases added).

As a result, we find that Broad Creek Marina breached the Lease with J&W when it relocated J&W's operations to the boat shed. That brings us to the question of whether the master should have awarded nominal damages because of that breach.

The right to nominal damages emerges when a right is violated, regardless of whether general damages can be proven. *See Bergstrom v. Palmetto Health All.*, 358 S.C. 388, 397, 596 S.E.2d 42, 46 (2004) ("A cause of action accrues at the moment when the plaintiff has a legal right to sue on it. The law presumes at least nominal damages at that point. The fact that substantial damages did not occur until later is immaterial to determining when the action accrued or arose.") (quoting

---

[19] We acknowledge that at various points during their testimony, Broad Creek Marina's employees downplayed the severity of the disagreement over the office space. However, this is not evidence that J&W agreed to operate out of the space, and the master does not refer to this testimony in his final order.

*Stephens v. Draffin,* 327 S.C. 1, 4–5, 488 S.E.2d 307, 309 (1997)); *Grooms v. Med. Soc. of S.C.*, 298 S.C. 399, 402, 380 S.E.2d 855, 857 (Ct. App. 1989) ("The law presumes the existence of at least nominal damages for the violation or infringement of a legal right.").

For example, in *56 Leinbach Investors, LLC v. Magnolia Paradigm, Inc.*, this court found that a lessee could recover nominal damages when both parties breached a lease. 411 S.C. 466, 478–79, 769 S.E.2d 242, 249 (Ct. App. 2014). In that case, the lessee had attempted to abate its rent after the property's owner subsequently leased out a portion of the same lot for a communications tower. *Id.* at 470–71, 769 S.E.2d at 245. The court agreed with the lessor that the lessee could not abate its rent under the facts of the case, and that the failure to pay the full rent constituted breach. *Id.* at 477, 769 S.E.2d at 248. The court found that the lessor had also breached but the lessee's "proof as to damages was only speculative and does not support an award of actual damages." *Id.* As a result, the court found the lessee was "entitled to nominal damages for [the lessor's] breach." *Id.* at 478–79, 769 S.E.2d at 249.[20]

Indeed, requiring a party to "prove" the amount of nominal damages is a legal oxymoron. *See* 22 Am. Jur. 2d *Damages* § 8 (May 2023 update) ("The term 'nominal damages' describes two types of awards: (1) those damages recoverable where a legal right is to be vindicated against an invasion that has produced no actual, present loss of any kind; and (2) the very different allowance made when actual loss or injury is shown, but the plaintiff fails to prove the amount of damages." (footnote omitted)); *id.* at § 9 ("Only where the jury concludes that the sole injury that the plaintiff suffered was the deprivation of his or her rights without any physical, emotional, or financial damages *or is unable to compute the monetary damages except by engaging in pure speculation and guessing* should it award nominal damages. Nominal damages should be minimal awards for technical violations of legal rights when no actual damages are sustained, or *no actual damages have been proven*." (footnote omitted) (emphases added)); *id.* ("Nominal damages are appropriate only when plaintiffs are unable to prove any amount of damages and are not properly awarded when a plaintiff has established a quantifiable loss of revenue."); *but see Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 800 (2021) ("Nominal damages are not

---

[20] There is at least one distinction between *56 Leinbach Investors, LLC* and our case. In *56 Leinbach Investors, LLC*, the lessor had claimed that the lessee "suffered only nominal damages" as opposed to damages that would have given it the right to abate. *Id.* at 470, 769 S.E.2d at 244. However, this distinction does not change whether the lessee in that case—or this one—*could* collect nominal damages.

a consolation prize for the plaintiff who pleads, but fails to prove, compensatory damages. They are instead the damages awarded by default until the plaintiff establishes entitlement to some other form of damages, such as compensatory or statutory damages.").

Here, J&W suffered the loss of its right to an office that met the terms of the Lease. That entitled J&W to nominal damages. As a result, we reverse and remand to the master for his entry of a judgment for nominal damages on behalf of J&W.

## C.    Equitable Setoff for Location in Boat Shed

J&W argues that the master erred by not finding it was entitled to an equitable setoff because of the time it spent using the boat shed as an office. We disagree.

First, a procedural note: We reject Broad Creek Marina's contention that this portion of J&W's argument to this court is barred by the two-issue rule. *See Jones v. Lott*, 387 S.C. 339, 346, 692 S.E.2d 900, 903 (2010) ("Under the two[-]issue rule, where a decision is based on more than one ground, the appellate court will affirm unless the appellant appeals all grounds because the unappealed ground will become the law of the case."), *abrogated on other grounds by Repko v. Cnty. of Georgetown*, 424 S.C. 494, 818 S.E.2d 743 (2018). Broad Creek Marina argues that because J&W did not specifically appeal the judgment for Broad Creek Marina on a breach-of-contract claim, this appeal is not properly before us.

That cuts against the entire idea of equitable setoff, which is rooted in the idea that valid damages can be offset to the extent that the party being awarded damages is also responsible for damages to the other party. *See* 20 Am. Jur. 2d *Counterclaim, Recoupment, Etc.* § 6 ("The right to setoff does not operate as a denial of the plaintiff's claim, but rather allows the defendant to set off the debt that the plaintiff owes the defendant against the plaintiff's claim against the defendant.") (May 2023 update); *see also id.* at § 5 ("Recoupment rests upon the principle that it is just and equitable to settle in one action all claims growing out of the same contract or transaction; the object of the plea is to rebate or recoup, in whole or part, the claim sued on."). Therefore, an appeal of the denial of equitable setoff does not require an appeal of the underlying judgment. Equitable setoff cannot exist without *a valid judgment* to set off. If there were no breach of contract judgment for Broad Creek Marina, J&W would not need to argue for equitable setoff at all.

Moving to the merits, we evaluate this claim under a more flexible standard of review. "In equity actions[,] an appellate court can review the record and make

findings based on its view of the preponderance of the evidence."  *Ingram v. Kasey's Assocs.*, 340 S.C. 98, 105, 531 S.E.2d 287, 290–91 (2000).

"The right to offset mutual demands is founded upon equitable principles and the tendency of the courts is to liberalize rather than restrict this right."  *Brown v. Lowe*, 182 S.C. 9, 12, 188 S.E. 182, 184 (1936).

Regardless of our standard of review or the legal principles applicable in considering equitable setoff, we face an insurmountable obstacle in reviewing J&W's argument for relief on this ground:  We do not know what the relief would be because J&W has not told us.  At no point in the trial before the master, and at no point in its argument to this court, has J&W laid out any way of calculating the relief it is due under its theory of setoff.  *Cf. In re Fruehauf Trailer Corp.*, 414 B.R. 36, 42 (Bankr. D. Del. 2009) ("[B]ased on the equitable nature of setoff, in permitting setoff, a court may *calculate* the setoff in the way it deems most equitable." (emphasis added)).

Setoff is indeed in equity, but that does not mean the court can pluck a number from the sky to fulfill it.  There must be a calculation or some other tangible basis for setting an amount of damages available for the setoff.  We are not certain based on J&W's brief before this court what that calculation would entail.  There has been no evidence of the difference in value between spending ten years in the boat shed and spending ten years in a floating office.  If we are supposed to use lost profits as our guidepost—which seemed to be the argument counsel made at trial—then we are without the kind of evidence that would allow us to make such a determination.  *See Moore v. Moore*, 360 S.C. 241, 254, 599 S.E.2d 467, 473–74 (Ct. App. 2004) ("The crucial requirement in lost profits determinations is that they be established with reasonable certainty, for recovery cannot be had for profits that are conjectural or speculative.  The proof must pass the realm of conjecture, speculation, or opinion not founded on facts, and must consist of actual facts from which a reasonably accurate conclusion regarding the cause and the amount of the loss can be logically and rationally drawn." (quoting *Drews Co. v. Ledwith-Wolfe Assocs.*, 296 S.C. 207, 213, 371 S.E.2d 532, 535–36 (1988))); *id.* at 254–55, 599 S.E.2d at 474 ("Proof may be established through expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, comparison with profit performance of businesses similar in size, nature and location, comparison with profit history of plaintiff's successor, comparison of similar businesses owned by plaintiff himself, and use of economic and financial data and expert testimony." (quoting *Global Prot. Corp. v. Halbersberg,* 332 S.C. 149, 158, 503 S.E.2d 483, 487 (Ct. App. 1998))).  Even before this court, all J&W asks for is "a substantial set-off."

We are also mindful of Broad Creek Marina's argument that the master provided a kind of setoff by not awarding prejudgment interest on the Lease payments despite his finding that Broad Creek Marina was "entitled" to them. Indeed, the master's order states: "Although it is clear that Tenant owes all back payments as set forth above, to add pre-judgment interest in the face of an obvious deficiency in the office space would be inequitable and would be contrary to the interests of justice in this case." That statement shows that the master was aware of the issues J&W raised and took them into account as a basis to equitably reduce the damages he awarded to Broad Creek Marina.

Aside from those efforts by the master, he would not have been able to determine a reliable amount of damages to apply as a setoff even if he were inclined to go further. For that reason, we affirm the circuit court's decision on equitable setoff.

## II.    THE FLOATING OFFICE (J&W's Issue II)

J&W contends that the master erred by ordering J&W to move into the Aqua Lodge because the structure violates South Carolina regulations and it does not fulfill the terms of the interim order. We agree with the master.

We use the standard of review for equity when considering an order for specific performance. *See Ingram*, 340 S.C. at 105, 531 S.E.2d at 290 (finding that an "action for specific performance . . . is in equity"); *Campbell*, 361 S.C. at 262, 603 S.E.2d at 627 ("An action for specific performance is one in equity."). "In equity actions[,] an appellate court can review the record and make findings based on its view of the preponderance of the evidence." *Ingram*, 340 S.C. at 105, 531 S.E.2d at 290.

J&W's first ground for this assignment of error is built on a misinterpretation of the regulations governing OCRM. It is true that a provision prohibits nonwater-dependent structures in areas such as the one at issue in this case "unless there is no significant environmental impact, an overriding public need can be demonstrated, and no feasible alternatives exist." S.C. Code Ann. Regs. 30-12(M)(2). However, a "nonwater-dependent" structure is considered "a facility which cannot demonstrate that dependence on, use of, or access to coastal waters is essential to the functioning of its primary activity." S.C. Code Ann. Regs. 30-1(D)(36). Therefore, the master's unwillingness to use this as a ground to reject the Aqua Lodge was reasonable. The regulation does not prohibit the permitting of the Aqua Lodge.

The remainder of J&W's argument against the Aqua Lodge is that the facility does not fulfill the required "20-year anticipated service life" the master imposed for the floating office in his interim order. J&W argues that because the president of the company providing the Aqua Lodge would not guarantee two decades of life, the vessel violates the order.

This argument has no merit. The president of the company also stated that "when properly maintained, Aqua Lodges can remain in service for twenty (20) years or longer." While a guarantee would certainly fulfill the order's requirement of an anticipated 20-year life, nothing in the master's order suggests one is necessary. The master obviously found the statement by the president of the company to be sufficient, and even given our more flexible standard of review on this issue, we see no error in that determination. We affirm on this ground. *See Ingram*, 340 S.C. at 105, 531 S.E.2d at 290–91 ("In equity actions[,] an appellate court can review the record and make findings based on its view of the preponderance of the evidence. However, *this [c]ourt is not required to disregard the findings of the trial judge who saw and heard the witnesses and was in a better position to judge their credibility*." (emphasis added) (citations omitted)).

## III.  INSURANCE AND DOCK DAMAGES (J&W's Issues V and VI)

### A.  Responsibility for Damage to the Docks

J&W argues that the Master-in-Equity erred by finding that J&W was required to reimburse Broad Creek Marina for the repair of the docks following Hurricane Matthew. We disagree.

Because this part of J&W's appeal challenges the court's finding of a breach of contract, we apply the standard of review for actions at law tried without a jury. *See Walterboro Cmty. Hosp. v. Meacher*, 392 S.C. 479, 484, 709 S.E.2d 71, 73 (Ct. App. 2011) ("A breach of contract action is an action at law." (alteration removed) (quoting *Madden v. Bent Palm Invs., LLC*, 386 S.C. 459, 464, 688 S.E.2d 597, 599 (Ct. App. 2010))); *see also Bluffton Towne Ctr., LLC*, 412 S.C. at 562, 772 S.E.2d at 887 ("A lease agreement is a contract, and an action to construe a contract is an action at law." (quoting *Middleton*, 388 S.C. at 14, 694 S.E.2d at 34)); *Duncan*, 384 S.C. at 425, 682 S.E.2d at 790 ("In an action at law, tried without a jury, the trial court's findings of fact will not be disturbed unless found to be without evidence which reasonably supports the court's findings." (quoting *Stanley*, 377 S.C. at 409, 661 S.E.2d at 64)).

As a reminder, "[t]he elements for breach of contract are the existence of the contract, its breach, and the damages caused by such breach." *Branche Builders, Inc.*, 386 S.C. at 48, 686 S.E.2d at 202.

Here, we know that a contract exists. Assuming for a moment that a breach is proven, the damages are Broad Creek Marina's payment for the work on the docks. Our task is to determine whether the master properly determined that the contract was breached.

"Where a contract is unambiguous, the matter becomes one of law and the parties' intent as clearly set forth in their agreement must be given effect. Conversely, where a contract is ambiguous, the fact finder must ascertain the parties' intentions from the evidence presented." *Duncan*, 384 S.C. at 424–25, 682 S.E.2d at 790 (citation omitted).

In our view, the master's focus on the liability and indemnity provision of the Lease was misplaced. A plain reading of that provision reveals that it concerns not whether J&W must indemnify Broad Creek Marina in a conflict between the two of them, but whether J&W must indemnify Broad Creek Marina from any third-party action. *Cf. Fountain v. Fred's, Inc.*, 436 S.C. 40, 47, 871 S.E.2d 166, 170 (2022) ("Indemnity is that form of compensation in which a first party is liable to pay a second party for a loss or damage the second party incurs to a third party." (quoting *Vermeer Carolina's, Inc. v. Wood/Chuck Chipper Corp.*, 336 S.C. 53, 60, 518 S.E.2d 301, 305 (Ct. App. 1999))).

Nonetheless, the lease is reasonably clear as to which party bears responsibility for the cost of any dock repair. The contract provides that "[a]s it becomes necessary to repair or replace the dock which is a portion of the Lease Property, [Broad Creek Marina] shall complete said repairs or replacement and [J&W] shall pay to [Broad Creek Marina] all costs attributed to its use, said costs to be paid as they are incurred by [Broad Creek Marina]." Despite the energy expended by the parties and the master on causation, this provision does not require any proof of causation. The most straightforward reading of the contract is that there will be a need to repair or replace the docks at the marina at some time, and at that time, J&W is responsible for the costs incurred by Broad Creek Marina in repairing those docks that J&W uses.

As a result, while we do not endorse the master's reading of all of the provisions of the Lease, we agree with his statement that "the various provisions of the Lease lead to a uniform conclusion: [J&W] is responsible for the cost of repairs

and maintenance to the docks that are the portion of the Lease Property, regardless of the legal cause of the damage." We affirm.[21]

## B.     The Settlement Agreement's Effect on the Lease

J&W argues that the master erred by not holding that the Settlement Agreement essentially absolved J&W of any responsibility for helping to repair the docks or provide insurance on the docks. We disagree.

"In construing terms in contracts, [a c]ourt must first look at the language of the contract to determine the intentions of the parties." *C.A.N. Enters., Inc. v. S.C. Health & Hum. Servs. Fin. Comm'n*, 296 S.C. 373, 377, 373 S.E.2d 584, 586 (1988). "When a contract is unambiguous, clear and explicit, it must be construed according

---

[21] We also agree with the master's finding that even if the contract is ambiguous, J&W appears to have been under the same belief as far as its liability for the costs of dock repairs. J&W sent a letter to its insurance company in 2016 appearing to accept that it "is responsible for repairs to its leasehold property in the event of damage" and "calling upon [the insurer] to immediately undertake whatever investigation you deem necessary to evaluate the damage, so that you may be in a position to provide the coverage J & W purchased under its policy." *See Duncan*, 384 S.C. at 425, 682 S.E.2d at 790 ("Conversely, where a contract is ambiguous, the fact finder must ascertain the parties' intentions from the evidence presented."). We are less certain than the master that Scurry conceded at trial that J&W was responsible for the post-Matthew repair of the docks. Scurry did testify that "[t]he cost of the repairs, in my understanding, was for the landlord to make and bill me." However, that appears to have been Scurry's answer to a generalized question about dock repair, and he does not appear to have specifically said, in the exchange that followed, that J&W was responsible for the post-Matthew repairs. Finally, there are ambiguities in the Lease as to the use of the pronoun "its" in a provision relating to the docks: "As it becomes necessary to repair or replace the dock which is a portion of the Lease Property, Landlord shall complete said repairs or replacement and Tenant shall pay to Landlord all costs attributed to its use, said costs to be paid as they are incurred by Landlord." Using "the dock which is a portion of the Lease Property" instead of J&W as the antecedent for "its," the final part of the sentence essentially communicates that all costs attributed to the use of that dock—in other words, all repairs making it suitable for use—are J&W's responsibility. Simply put, there is evidence in the record to support the master's alternative finding on the ambiguity of the contract.

to the terms the parties have used, to be taken and understood in their plain, ordinary and popular sense." *Id.*[22]

The Settlement Agreement signed by the parties was exceedingly clear that it made no changes to the Lease other than those explicitly addressed in the agreement. The "Recitals" section of the Settlement Agreement expressly stated that the Lease was incorporated into the Settlement Agreement and "the Parties specifically reaffirm and ratify the terms and conditions of the Lease attached hereto and incorporated herein by reference, *not specifically modified by the terms* of this document." (Emphasis added). Furthermore, in the "Consideration" section of the Settlement Agreement, it reiterates that "[e]xcept as set forth, amended or modified herein, all terms and conditions of the Lease remain in full force and effect."

J&W does not point to any language in the Settlement Agreement that nullifies any of the Lease's provisions about dock repair or insurance. Instead, it invites this court to read between the lines and surmise the parties' possible motivations for signing the deal, regardless of what they committed to paper. We cannot do that. We are guided by the "unambiguous, clear and explicit" texts of the Lease and the Settlement Agreement.

For the same reason, we reject J&W's attempts to direct our attention to the testimony of Scurry and Freedman regarding their understandings of the language. The agreements in this case say what they say, and there is no ambiguity that would justify our reliance on outside information. *See C.A.N. Enterprises, Inc.*, 296 S.C. at 377–78, 373 S.E.2d at 586 ("Extrinsic evidence giving the contract a different meaning from that indicated by its plain terms is inadmissible.").[23] The Settlement Agreement is clear that the Lease applies except where it is specifically altered by the Settlement Agreement. The Lease is clear that J&W is required to carry its own liability insurance, and the Settlement Agreement does not claim to change that.

---

[22] Indeed, we find it instructive that the *C.A.N. Enterprises* court made clear its displeasure with the result dictated by the contract. *See id.* at 377, 373 S.E.2d at 586 ("Although we acknowledge that [one party] will receive a windfall, we reluctantly decline to interpret the contract as the State urges."); *id.* at 378, 373 S.E.2d at 587 ("Our duty is limited to the interpretation of the contract made by the parties themselves '. . . regardless of its wisdom or folly, apparent unreasonableness, or failure to guard their rights carefully.'" (alteration in original) (quoting *Gilstrap v. Culpepper*, 283 S.C. 83, 86, 320 S.E.2d 445, 447 (1984))).

[23] Additionally, as previously noted, accounting for extrinsic evidence would also weaken J&W's case because of the letter to its own insurer.

Additionally, neither the Lease, nor the Settlement Agreement, nor any part of the master's order requires J&W to provide insurance coverage specifically for *the docks*. The Lease instead expressly requires "insurance for personal property, trade fixtures[,] and property damage, as well as environmental coverage and a public liability policy," and sets certain requirements for that coverage. The master's order requires compliance with the insurance provision of the Lease. It does not specifically require the docks to be insured by J&W. Even if it would be error to require that, the master did not make that error.

In its brief, J&W argues that it would be illogical to believe that it agreed to both pay for Broad Creek Marina's insurance and carry its own insurance that could also be used to help cover the damage to the docks. However, that contradicts the Lease that J&W signed in 1993. There, J&W agreed to just such an arrangement.

> Tenant agrees to pay, upon demand, as Additional Rent, any and all premiums of insurance carried by the Landlord on the Property resulting from Tenant's use or occupancy. Tenant shall keep in full force and effect at Tenant's expense, insurance for personal property, trade fixtures and property damage as well as environmental coverage and a public liability policy all in form and substance reasonably satisfactory to Landlord, in which Tenant and Landlord shall be named as the Insured with the following minimum coverage: one million dollars (and to be upwardly adjusted yearly to reflect inflation rates).

Why it would be unreasonable for J&W to agree to the same arrangement for covering potential damage to the docks 11 years later is unclear. We affirm the master on this ground.

## IV.   QUASHED SUBPOENA, RELATED DAMAGES (J&W's Issue VII)

Finally, J&W argues that the master erred by quashing a subpoena for certain records and for awarding damages that might have been affected by those records. We disagree with the first contention but partially agree on the second.

### A.   Quashed Subpoena

J&W challenges the master's decision to quash its subpoena, issued a week before trial, for an extensive set of business records from Broad Creek Marina employees. We see no error in the master's decision.

"The admission of evidence is within the sound discretion of the trial judge, and absent a clear abuse of discretion amounting to an error of law, the trial court's ruling will not be disturbed on appeal." *Vaught v. A.O. Hardee & Sons, Inc.*, 366 S.C. 475, 480, 623 S.E.2d 373, 375 (2005).  "To warrant reversal based on the admission or exclusion of evidence, the appellant must prove both the error of the ruling and the resulting prejudice, *i.e.*, there is a reasonable probability the jury's verdict was influenced by the wrongly admitted or excluded evidence." *Id.*

Here, J&W was required to serve each party with written notice of the subpoena at least ten days before the time specified for compliance.  Rule 45(b)(1), SCRCP (amended 2020).[24]  The subpoena for additional documents from Rachels is dated May 8, 2019.  The subpoena required her to comply by the morning of May 15, 2019.  Because J&W did not provide the required ten days' notice, the master properly granted the motion to quash.

## B.    Measure of Damages

As to the damages themselves, J&W contends that there was insufficient evidence to support some of the damages the master awarded to Broad Creek Marina.  We agree in part.

> The trial judge has considerable discretion regarding the amount of damages, both actual or punitive.  Because of this discretion, our review on appeal is limited to the correction of errors of law.  Our task in reviewing a damages award is not to weigh the evidence, but to determine if there is any evidence to support the damages award.

*Austin v. Specialty Transp. Servs., Inc.*, 358 S.C. 298, 310–11, 594 S.E.2d 867, 873 (Ct. App. 2004) (citations omitted).  However, this lenient standard of review does not mean that a trial court or master is freed from the requirement of evidence.

> Generally, in order for damages to be recoverable, the evidence should be such as to enable the court or jury to

---

[24] This requirement appeared in paragraph (b)(1) in the version of the South Carolina Rules of Civil Procedure that was in place at the time the subpoenas were issued in the present case.  The 2020 amendment moved this provision to new paragraph (a)(4) and specified that the written notice must be a copy of the subpoena.  *See* Rule 45, SCRCP, Note to 2020 Amendment.

determine the amount thereof with reasonable certainty or accuracy. While neither the existence, causation nor amount of damages can be left to conjecture, guess or speculation, proof with mathematical certainty of the amount of loss or damage is not required.

*Whisenant v. James Island Corp.*, 277 S.C. 10, 13, 281 S.E.2d 794, 796 (1981).

We see at least two portions of the damages award for which the evidence did not "enable the court . . . to determine the amount thereof with reasonable certainty or accuracy." *Whisenant*, 277 S.C. at 13, 281 S.E.2d at 796. The first is Broad Creek Marina's charges for lot maintenance fees. We have been unable to locate in the record—and Broad Creek Marina has not pointed to any place in the record—where Broad Creek Marina proved that $133.12 was the correct monthly charge.

As we previously stated, Rachels conceded that J&W's monthly share of the lot maintenance costs under Exhibit F should have been approximately $119.79, instead of the $133.12 that Broad Creek Marina had sought. Rachels explained that she "just continued billing [J&W] what was being billed when I started." However, she also testified that (1) the [overall] lot maintenance fee had greatly increased since 2004, when the Settlement Agreement incorporating Exhibit F was signed; (2) she had not yet increased the amount billed each month; and (3) if current wage conditions were used to calculate the dock maintenance fee and J&W was charged the same proportion of those costs, the company would now be charged $144.21 a month. This may explain why the master did not make a downward adjustment of the damages award. But rather than speculate on the master's reasoning, we find it appropriate to remand this precise question to the master for re-calculation of the amount due for lot maintenance fees "with reasonable certainty or accuracy." *Id.*

More difficult is the issue of the portion of Broad Creek Marina's insurance premiums for which J&W was responsible. There are statements by Rachels that at least facially suggest she was using accurate numbers when breaking down the insurance costs. For example, at one point she testified:

Every year, seems like, it's different; but I do remember the lady in [the insurance agent's] office forwarding me the spreadsheet that listed the different properties, like each building and the percentage of policy, the percentage of the total amount of the premium, that that would apply to.

> One of those items was docks and piers, and that's the portion of the total . . . that I would have charged J&W 7-and-a-half percent for just the docks and piers.

But it is clear that Rachels did not provide the court with the underlying documentary basis for the share of the insurance costs that would be attributed to J&W. According to J&W, this produced an excess of $10,566.47 in the damages award.

However, our supreme court has ruled that even in a *de novo* review, a court's damages findings could not be overturned without the contesting party providing some evidence. In *Lewis v. Lewis,* our supreme court found that a family court properly valued the marital home at $800,000, in line with one party's expert, when the other party "offered only cursory valuation evidence and focused almost exclusively on disputing the appraiser's value." 392 S.C. 381, 392–93, 709 S.E.2d 650, 655–56 (2011). "We have stated before, and we reiterate here, that a party cannot sit back at trial without offering proof, then come to this [c]ourt complaining of the insufficiency of the evidence to support the family court's findings." *Id.* at 393, 709 S.E.2d at 656 (quoting *Honea v. Honea,* 292 S.C. 456, 458, 357 S.E.2d 191, 192 (Ct. App. 1987)). The *Lewis* court also noted that because this court could not calculate damages without accepting additional evidence, this court had remanded the case to the family court to do so, unfairly giving the party who had not provided further evidence "a second bite at the apple." *Id.* at 393 n.11, 709 S.E.2d at 656 n.11.

On one hand, there is a clear distinction between this case and *Lewis*: There is evidence in the record that the documents that would back up how much Broad Creek Marina charged J&W for the insurance were in Broad Creek Marina's exclusive control, unlike *Lewis*, where either party could have had the property appraised. On the other hand, J&W waited from the time of a deposition in January until seven days before the trial in May to subpoena the documents. While the burden of proof at trial was on Broad Creek Marina, it did produce some evidence of its damages; J&W did not properly request the evidence that could have disputed the precise amount of the insurance charges. Some portion of the insurance premiums were validly charged, and J&W did not produce evidence of those portions—if any—that were not validly charged.

As a result, we remand the issue of lot maintenance fees for the master's re-calculation based on Exhibit F and Rachels's testimony and affirm as to the payments for insurance premiums.

## CONCLUSION

For the foregoing reasons, we dismiss the first issue as moot and reverse the master's ruling on nominal damages. Further, we remand for the imposition of nominal damages against Broad Creek Marina and a re-calculation of the judgment against J&W based on the master's determination of a reasonably accurate amount due for lot maintenance fees. All other rulings of the master are affirmed.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**WILLIAMS, C.J., and VERDIN, J., concur.**