694 S.E.2d 31

**Ernest F. MIDDLETON, III, and Marjorie Ann Middleton as Co–Trustees Under the Last Will and Testament of Ernest F. Middleton, Jr., Appellants,**

v.

**Manly EUBANK, 1625 Partnership, A South Carolina General Partnership, and Palmetto Ford, Inc., Respondents.**

No. 4675.

Court of Appeals of South Carolina.

Heard Dec. 10, 2009.

Decided April 19, 2010.

Rehearing Denied June 24, 2010.

10

Thomas H. Hesse and Daniel S. McQueeney, Jr., both of Charleston, for Appellants.

J. Rutledge Young, Jr., Stephen L. Brown, Russell G. Hines, and Stephen A. Spitz, all of Charleston, for Respondents.

SHORT, J.

In this dispute involving the interpretation of a real property lease, Ernest Middleton, III, and Marjorie Middleton (collectively, Appellants), as co-trustees of the will of Ernest Middleton, Jr., appeal from the Master–in–Equity's order finding in favor of Manly Eubank, 1625 Partnership, and Palmetto Ford, Inc. (collectively, Respondents), the lessees of the property owned by Ernest Middleton, Jr. We affirm.

## FACTS

On July 28, 1983, Ernest Middleton, Jr. (Lessor) signed a lease with Eubank, individually and as President of Palmetto Ford, Inc., and Hugh Cannon (Lessees), whereby Middleton leased real property in Charleston, South Carolina to Palmetto Ford to relocate its dealership on the land.[1] The leased property was composed of two tracts: a 3.476–acre tract on Highway 17, and a 4.79–acre tract.[2] The two parcels were

---

1. On July 22, 1983, the parties signed an agreement that detailed the provisions to be included in the lease. Four months later, the lease was amended by a supplemental agreement. On January 18, 1984, Eubank, Hugh Cannon, and Palmetto Ford assigned the property lease to 1625 Partnership. Thereafter, on October 30, 1984, the lease was amended to add a new section entitled "Leasehold Mortgage." The lease term began on November 1, 1984.

2. Tax map numbers 349–01–00–014 and 349–01–00–026.

separated by a third tract that was owned by a third party. At that time, Ford required its dealerships to be built on at least seven acres of property. Therefore, the parties agreed the lease would be contingent upon the acquisition of an easement to the third-party tract of land that would provide access between the two parcels of land, allowing the two parcels to function as one and meet Ford's acreage requirement. Almost one year later, Lessor and 1625 Partnership were granted two easements for $25,000 in consideration paid by 1625 Partnership and $200 per month to use a portion of the property owned by the third party to provide "vehicular and pedestrian access to and from both parcels" of the leased land. The first easement connected the two separated parcels and the other provided access from the property onto Highway 17. The lease described the property as being composed of two tracts, but referred to them collectively as the "Property." The lease did not mention the easements. The lease further stated the Respondents would be making improvements to the property:

> Leesee [sic] will have improvements constructed and added to the Property, at a cost of approximately $1.1 million, including buildings, paved areas for display and parking of vehicles, driveways, lighting, signs, landscaping, and the equipment and fixtures (such as heating and air conditioning) which are customarily deemed to become a part of the real property to which they are affixed (but excluding equipment which is solely for automotive uses) (hereinafter, all such included improvements shall be collectively referred to as the "Improvements").

The lease provided the initial term of the lease would be for thirty years, with the possibility of two ten-year renewals, and the annual rent would be an amount equal to nine percent of the valuation of the property, to be paid in monthly installments. The lease listed the then-current value of the parcels separately and together. The property was to be revalued three years from the first day of the lease term, and every three years thereafter, and the rent for the following three years was to be based on the valuation set at that time. Section four of the lease, titled "Valuation," stated, "The property shall be revalued by a MAI appraisal based on raw, unencumbered land with no Improvements, for the highest and best use thereof at such time, without regard to any

improvements thereon or to the use then being made of the property by lessee." [3] Further, the lease provided the "Valuation [of the property] shall not be decreased during the first Fifteen (15) years of the Property Lease term, and that the Valuation for this same Fifteen (15) years shall not be increased more than Six percent (6%) per year."

Several different appraisers appraised the land from 1984 to 2005. The initial appraisal was done on January 13, 1984. Fred Attaway, Jr., MAI, valued the property, after the completion of the proposed improvements, at $1.83 million for the fee simple estate and at $1.3 million for the leasehold estate.[4] On January 24, 1994, Attaway re-appraised the raw land at $1.23 million and the leased estate at $1.5 million. In this appraisal, Attaway mentions the property is divided into two parcels that can function fully; however, he states the division has a negative effect on the value because the property is separated by an access easement. On August 11, 1999, Attaway appraised the property at $2.1 million for the fee simple estate, considering the tracts as one parcel because they function as one. Appellants did not increase the rent after the 1999 appraisal because the parties disagreed about the amount of the appraisal. As a result, the parties reached a temporary agreement that the valuation for the following three years would be $1.7 million.

In 2002, Christopher Donato, MAI, appraised the property for Appellants. On November 13, 2002, Donato appraised the land "as is" at $2,897,000. He appraised the property as one parcel connected by the easements because the "two easements facilitate access to both tracts and have the affect of linking the two tracts such that they can be used in concert." One month later, Donato re-appraised the land at $2,845,000. In this appraisal, at the request of Respondents, he appraised the property as separate tracts independent of each other without the access easements. On October 21, 2005, Donato appraised the land "as is" at $6.34 million.

Michael Robinson, MAI, appraised the property for Respondents. On March 3, 2003, Robinson appraised the 3.476–acre

---

3. Hereinafter referred to as "the valuation clause."

4. This appraisal was completed prior to the acquisition of the easements.

tract, as if vacant, at $1,911,800 and the 5.577–acre tract, as if vacant, at $655,300. He appraised the property as two separate and distinct tracts. Hugh Cannon, the attorney who drafted the lease, contacted Robinson in January or February 2003 and suggested the easements should not be considered in the appraisal. On November 15, 2005, Robinson appraised both tracts, as if vacant, at $3,504,400.

On March 2, 2006, Appellants filed a complaint in Charleston County Court of Common Pleas against Respondents, seeking a judicial declaration as to the rights and obligations of the parties under the Lease. The complaint alleged that based on the clear language of the valuation clause, the parties intended that the appraisal would be based upon the most valuable and profitable use of the property, which includes the easements and appraising both parcels together as a unit. However, Respondents asserted the parcels must be appraised as separate, unrelated, and unconnected parcels. Appellants also claimed Respondents refused to agree on a methodology for appraising the value of the property. In their amended answer, Respondents alleged:

> [T]he "Property," as defined in the Lease and as it actually existed at the time the Lease was entered, was two separate and distinct tracts of land, not connected by easements, and thus the "Property" that is to be revalued pursuant to [the valuation clause] should continue to consist of two separate tracts of vacant land, as they existed on July 28, 1983, unconnected by any easements and should therefore continue to be appraised as raw, unencumbered land with no Improvements as set forth in the Lease.

On July 30, 2007, the parties consented to refer the declaratory judgment action to the Master–in–Equity for Charleston County. A non-jury trial was held on December 5 and 6, 2007. At the close of the presentation of their case, Appellants moved for a directed verdict on the question of whether an easement is an improvement under the law and the lease.[5] At the conclusion of the trial, the master ruled for Respondents from the bench, and on December 18, 2007, he issued his

---

5. The master did not rule on the motion, stating: "Aren't you getting a little ahead of yourself? ... You are asking me, essentially, for the

order. The master found that (1) the lease was unambiguous; (2) the plain language of the lease negated consideration of easements in the revaluation; (3) the easements were improvements; (4) the parties' subsequent conduct supported his interpretation of the lease; and (5) Appellants' interpretation of the lease would lead to unjust or absurd results. Appellants filed a motion for new trial, or in the alternative, for reconsideration, pursuant to Rule 59(e), SCRCP, which was denied. This appeal followed.

## STANDARD OF REVIEW

A declaratory judgment action is neither legal nor equitable, but is determined by the nature of the underlying issue. *Felts v. Richland County*, 303 S.C. 354, 356, 400 S.E.2d 781, 782 (1991). A lease agreement is a contract, and an action to construe a contract is an action at law. *Duncan v. Little*, 384 S.C. 420, 424, 682 S.E.2d 788, 790 (2009); *Piedmont Interstate Fair Ass'n v. City of Spartanburg*, 274 S.C. 462, 465, 264 S.E.2d 926, 927 (1980). "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *McGill v. Moore*, 381 S.C. 179, 185, 672 S.E.2d 571, 574 (2009). When a contract's language is clear and unambiguous, the language alone determines the force and effect of the contract. *Id.* "A contract is read as a whole document so that one may not create an ambiguity by pointing out a single sentence or clause." *Id.* However, if a contract is deemed ambiguous, the fact finder must ascertain the parties' intentions from the evidence presented. *Duncan*, 384 S.C. at 425, 682 S.E.2d at 790. "It is a question of law for the court whether the language of a contract is ambiguous." *McGill*, 381 S.C. at 185, 672 S.E.2d at 574. In an action at law, tried without a jury, the trial court's findings of fact will not be disturbed unless there is no evidence that reasonably supports the court's findings. *Id.*

## LAW/ANALYSIS

Appellants argue the master erred in ignoring the plain language of the lease that required a MAI appraisal of the

_____

ultimate decision in the case. And I've only heard from one side, the other side hadn't moved for any kind of motion, yet."

property according to its highest and best use at the time, which they assert includes the easements. We disagree.

All of the parties asserted the lease was unambiguous; therefore, the court was required to ascertain and give legal effect to the parties' intentions as determined by the contract language. *See McGill v. Moore*, 381 S.C. 179, 185, 672 S.E.2d 571, 574 (2009).

Appellants argue the revaluation of the property according to "its highest and best use at the time" must include the easements. Appellants assert their expert witnesses, Thomas Hartnett and Christopher Donato, both real estate appraisers, recognized the highest and best use of the property at the time they conducted their appraisals included the easements because the easements allowed the two separate tracts to function as one parcel. Therefore, they testified that pursuant to the valuation clause of the lease, the two parcels should be revalued as a single unified parcel with the connecting easements. They also testified the easements did not qualify as subsequently-acquired improvements that would be excluded under the valuation clause of the lease. However, Donato admitted that under Webster's Dictionary's definition of the word "improvement," the easements would be defined as improvements because they added a benefit and value to the property.

In contrast, Mike Robinson and Debra Haskell, both real estate appraisers hired by Respondents, testified the property should be valued as two separate parcels. They also testified the easements are subsequent improvements to the property; therefore, they should not be considered in revaluing the two tracts of land because "improvements" were to be excluded according to the valuation clause of the lease. The master stated he found Robinson and Haskell to be highly credible and persuasive.

In looking at the language of the lease, we note it referred to two separate and distinct tracts, and it does not mention the easements. As the master stated in his order, "the lease calls for just what it says—revaluation under paragraph [four] of the 'property' being 'leased,' and that is, quite clearly, the two separate and distinct tracts of land referred to [in] the Lease

16

itself." Therefore, we find the clear language of the lease supports the master's conclusion that "[i]t could not have been intended under the Lease itself, or under Section [four] of that Agreement, to address a future easement, sold to the parties a year after the lease was entered into, which was never previously owned by either the landlord or the tenant but by a totally independent third party." We also find the evidence supports the master's conclusion that this was the "only reasonable construction" of the lease when considered as a whole and "[t]o interpret a subsequent sale [the easements] as new leased property is contrary to common sense and would lead to an unjust and absurd result."

Because we affirm the master's finding that the lease was unambiguous and the plain language of the lease negated consideration of the easements in the revaluation of the property, we need not address Appellants' remaining arguments. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not review remaining issues when its determination of another issue is dispositive of the appeal).

## CONCLUSION

Accordingly, the master's order is

**AFFIRMED.**

THOMAS and KONDUROS, JJ., concur.