# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 23, 2024

Lyle W. Cayce
Clerk

———————

No. 23-10552

———————

Ancor Holdings, L.P., *By and through its general* Partner, Ancor Partner, Incorporated,

*Plaintiff—Appellant/Cross-Appellee*,

*versus*

Landon Capital Partners, L.L.C.,

*Defendant—Appellee/Cross-Appellant*,

ICON EV, L.L.C.; NexGen Lithium Batteries, L.L.C.,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:20-CV-1326

———————————————————————

Before Clement, Engelhardt, and Wilson, *Circuit Judges*.
Kurt D. Engelhardt, *Circuit Judge*:

This case stems from two separate letters of intent in which Plaintiff Ancor Holdings, L.P., by and through its general partner, Ancor Partner, Inc. ("Ancor") and Defendant Landon Capital Partners, L.L.C. ("Landon") would invest in and acquire a majority interest in Defendant ICON EV, L.L.C. ("ICON"). The deal fell through, and Landon and ICON entered

into their own agreement. Ancor sued Landon and ICON. The case proceeded to trial on, *inter alia*, Ancor's breach of contract claim against Landon and Ancor's tortious interference claim against ICON. The trial court determined at a pre-trial hearing that Ancor's declaratory judgment claim against both Landon and ICON would be decided post-verdict if Ancor were to prevail on its breach of contract claim. At the close of trial, instead of submitting Ancor's tortious interference claim to the jury, the trial court dismissed that claim as a matter of law. The jury found for Ancor on the breach of contract claim, and the trial court then denied Ancor's declaratory judgment claim. Ancor appealed and Landon filed a cross-appeal. For the following reasons, we REVERSE the trial court's grant of judgment as a matter of law to Landon on Ancor's declaratory judgment claim and judgment as a matter of law to ICON on Ancor's declaratory judgment claim and tortious interference claim, and REMAND to have these claims tried by a jury. The trial court's denial of judgment as a matter of law to Landon on Ancor's breach of contract claim is AFFIRMED. We further REVERSE in part the final judgment entered by the trial court and REMAND for further proceedings consistent with this opinion.

## I.

## A.

### Factual Background

In 2019, Roy Williams and Terry Trekas retained Global Growth Partners to help them procure debt financing for their company, ICON, a manufacturer of electric golf carts that can drive on public roads.[1] When a financing deal did not emerge, Global Growth contacted the president of

---

[1] ICON and Defendant NexGen Lithium Batteries, L.L.C., are collectively referred to as "ICON." NexGen makes the lithium batteries that power ICON's golf carts.

Ancor, Randy Keene, to pitch Ancor on investing in ICON. As an independent sponsor, Ancor invests in companies to help them grow with the goal of a potential sale. An independent sponsor finds companies to buy, brings other investors into the transaction to complete the purchase, and then conducts and pays for the due diligence for those investors.

On January 17, 2020, Ancor and ICON entered into a letter of intent ("ICON LOI"). Under the ICON LOI, a new company ("Newco") would be formed to acquire 51% of ICON based on a $25 million valuation. The ICON LOI provided for a 90-day "Exclusivity Period" during which ICON agreed not to pursue investment from anyone other than Ancor.

Ancor needed other investors. During the course of the Exclusivity Period, Keene was introduced to Chris Sullivan at Landon Capital, a family office private equity company. Sullivan had been told that Ancor may have a company in which Landon would be interested in investing. Sullivan called Keene in February 2020. On February 26, 2020, Landon and Ancor entered into a letter of intent ("Landon LOI") regarding the potential acquisition of ICON (the "Transaction"), proposing that Landon would invest $10 million and Ancor would invest $1 million. The terms of the Landon LOI were "non-binding on the Parties except as specified in Section 10 hereof," which addressed confidentiality. The Landon LOI provided in part that, if the Transaction were to close, "Ancor will receive a closing fee, payable in cash equal to the greater of 2.0% of enterprise value or $500,000 . . . [and] Ancor will be entitled to receive an annual management fee that is paid quarterly in the amount equal to the greater of 5% of EBITDA or $250,000."[2] In the event of a sale or other liquidity event, proceeds to both Ancor and Landon investors would be distributed pursuant to Section 5, which included a

---

[2] EBITDA stands for earnings before interest, tax, depreciation, and amortization.

No. 23-10552

"Promote Interest of 20.0% of the funds previously distributed for the Preferred Investment Return." Under Section 7, the parties agreed to a "Due Diligence Period," which was defined as "the period ending with the expiration or termination . . . of the [ICON LOI]," wherein Ancor and Landon would use reasonable efforts to complete "a due diligence investigation."

Section 8, referred to as the non-circumvention provision, is at issue in this case. Section 8 states in part:

> Landon and Ancor agree not to enter into any transaction with [ICON] without the participation of the other party on the terms as set forth herein until the expiration of the Due Diligence Period . . . . [E]ach agrees as follows:
>
> a)    If Landon decides not to move forward with the Transaction for any reason, it shall promptly notify Ancor. In such case, Ancor will be free to pursue the Transaction with any equity and other investors . . .
>
> b)    The Parties hereto agree that if at the conclusion of the Due Diligence Period (as the same may be modified . . . by mutual agreement of the parties to the Letter of Intent) the proposed Transaction has not closed, the joint arrangement between Landon and Ancor expressed in this Section 8 shall terminate and, as noted above, Ancor will be free to pursue the proposed Transaction with other equity investors and shall have no further liability or obligation to Landon.
>
> c)    Notwithstanding the foregoing, Landon shall not, directly or indirectly, enter into any agreement or transaction (including the Transaction) with [ICON] at any time unless it shall have obtained the prior written consent of Ancor and simultaneously provided Ancor all of the payments, reimbursements and/or other

4

consideration provided for in this Agreement, including Section 9 below.

Section 9 provided that, "[i]f the proposed Transaction is consummated, then, at closing, Newco shall reimburse Ancor for its reasonable out-of-pocket expenses and pay all third-party costs related to the Transaction." If the proposed Transaction were not consummated, however, "then Landon shall immediately upon request reimburse Ancor for 80% of all third-party costs incurred in connection with the proposed Transaction." Section 10 further required the parties to the Landon LOI to "maintain the confidentiality of all confidential and/or proprietary information regarding the proposed Transaction."

Section 11 was added in its entirety to the Landon LOI original draft. Section 11 states that the Landon LOI "represents only each Party's current intention to negotiate and enter into written definitive agreements governing the terms of the proposed Transaction . . . . Except for provisions of Sections 8, 9, 10 and this Section 11, which constitute binding agreements of the Parties, this Agreement is not and is not intended to be a binding agreement between the Parties." This Section further states that "[t]he provisions of Section 8, Section 9 and Section 10 shall survive the termination of this Letter of Intent (and any binding provision that shall have been breached shall survive the termination of this Agreement)." Section 11 also called for "Sections 8, 9, 10 and this Section 11" to be governed by the laws of the State of Delaware.

Due to the exigencies of the COVID-19 pandemic, Ancor asked ICON to sign an amendment to the ICON LOI extending the Exclusivity Period to July 15, which ICON agreed. This extended the Landon LOI Due Diligence

Period as well. The Transaction did not close, and, around this time, ICON's sales increased dramatically, along with its valuation.[3]

With July 15 nearing, Ancor prepared an amendment extending the Exclusivity Period to July 31, but Williams did not sign it. The July 15 deadline passed and the Transaction, again, did not close. On July 29, there was to be an "all hands call" to determine what final things remained to be done before closing, but Williams did not join the call. Williams was reluctant to close due to the dramatic increase in ICON's sales and expressed concern that the prior $25 million valuation was too low. The relationship between Keene and Williams also deteriorated. Williams no longer wanted Keene as a business partner, nor did he want to give up such a high valuation percentage of equity in ICON. Williams was also concerned that Ancor's Promote Interest would dilute Williams's interest in Newco.

Between late July to mid-August, Williams and Sullivan began contacting each other without Keene's knowledge. Williams told Sullivan not to tell Keene of their communications. Thereafter, on August 14, 2020, ICON's counsel sent a letter to Ancor formally terminating any further negotiations with Ancor. ICON and Landon proceeded to negotiate and signed a memorandum of terms on September 9. In the new transaction, Landon would invest $15 million for 30% equity in ICON, and receive no management fees, with ICON having a $50 million valuation. On December 8, 2020, ICON and Landon closed the deal.

---

[3] Trekas stated that ICON took off—doubling, even tripling in sales—during the COVID-19 pandemic because people were not taking vacations. As stated by Trekas, ICON's "sales were just insane."

No. 23-10552

## B.

## Trial Court Proceedings

On December 11, 2020, Ancor sued Landon and ICON. Ancor asserted the following claims against both Defendants: breach of duty of good faith and fair dealing; fraud; conspiracy; and declaratory judgment. Ancor sought exemplary damages and attorney's fees. Notably, Ancor also asserted a breach of contract claim against Landon and a tortious interference claim against ICON.

Ancor claimed Landon breached its contract "to not enter into any agreement or transaction with ICON and/or NexGen at any time without the prior written consent of Ancor," and breached Section 9 of the Landon LOI by "not reimbursing Ancor the $426,452.59 in out of pocket expenses and third party costs incurred by Ancor related to the Transaction." Regarding ICON, Ancor claimed ICON willfully and intentionally interfered with the Landon LOI by entering into its own transaction with Landon. As a result, Ancor claimed damages against both parties, consisting of unreimbursed expenses, a closing fee, and a management fee of 5% of EBITDA, in an amount to be determined at trial, but not less than $2,676,452.59. In its declaratory judgment, Ancor requested the following:

> Ancor is entitled its 20% Promote Interest; more specifically, that upon a subsequent sale or liquidity event for ICON, NexGen or any new entity with [sic] they may have formed in their transaction with Landon, the proceeds be distributed as follows: (1) first, to the investors until they receive all of their invested funds back, (2) next, to the investors until an 8% preferred return has been paid on the amount they had invested, (3) then, to Ancor up to an amount that equals 20% of the amount distributed to the investors on their "preferred return," and (4) finally, all remaining proceeds to be distributed pro-rata 80% to the investors and 20% to Ancor.

Ancor sought to submit its declaratory judgment claim to the jury, seeking to define "other consideration" as described in Section 8(c) of the Landon LOI, upon a circumvention of Ancor, to include the Promote Interest discussed in Section 5(c). Ancor thus sought a declaratory judgment that it would be entitled to its Promote Interest upon a subsequent sale or recapitalization of ICON. Ancor also sought to hold ICON jointly and severally liable for the Promote Interest due to ICON's tortious interference with the Landon LOI.[4]

The case went to trial. On December 9, 2022, the trial court held a pretrial hearing to consider, amongst other things, Landon's motion in limine. In its motion in limine, Landon sought to exclude "any discussion of the 20% Promote Interest as a form of damages, because there is no pleading requesting this as a form of monetary damages, and there is no evidence of any monetary value of such an interest." The trial court granted Landon's motion regarding the Promote Interest. The trial court later clarified that its ruling was in effect a decision that Ancor's claim for declaratory judgment would not be tried by a jury but would instead be decided by the trial court post-verdict if Ancor were to prevail on its breach-of-contract claim.

Trial began on December 12, 2022. At the close of Ancor's case in chief, ICON moved for judgment as a matter of law on each of Ancor's claims against ICON. Landon also moved for judgment as a matter of law on all claims. The trial court denied the Defendants' motions.

The next morning, after the parties had rested, Landon and ICON renewed their motions for judgment as a matter of law. The trial court initially denied ICON a directed verdict on Ancor's claim for tortious

---

[4] On February 12, 2021, Landon moved to dismiss for lack of personal jurisdiction. The court denied its motion. The parties filed other respective motions to dismiss and motions for summary judgment, which were all denied.

No. 23-10552

interference. A few minutes later, however, the trial court ruled from the bench, granting ICON's motion for judgment as a matter of law on all of Ancor's claims against it and granting Landon's judgment as a matter of law on all of Ancor's claims against Landon other than the breach of contract claim.

Ancor's breach of contract claim was submitted to the jury. The jury found that Landon breached Section 8(c) of the Landon LOI and awarded Ancor $1.75 million in damages—consisting of $1.25 million in management fees and the $500,000 closing fee. The jury also found that Landon breached Section 9 of the Landon LOI and awarded Ancor $362,542 in damages. Total damages equated to $2,112,542. After trial, Ancor renewed its motion for a declaratory judgment. The trial court denied Ancor's motion for the reasons stated in the Defendants' responses. Landon filed a renewed motion for judgment as a matter of law or, in the alternative, for new trial or remittitur, which was denied. Ancor appealed and Landon filed a cross-appeal.

## II.

## Jurisdiction

Jurisdiction is always first.[5] Landon argues in its cross-appeal that Ancor did not make a prima facie showing that Landon was subject to personal jurisdiction. The court reviews *de novo* whether the exercise of personal jurisdiction over a non-resident is proper.[6] *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 650 (5th Cir. 2004). The plaintiff is

---

[5] The parties did not raise jurisdiction at oral argument.

[6] Ancor is a Nevada corporation, and the limited partners of Ancor are Keene and Tim McKibbon, both residents of Texas. Landon is a Delaware limited liability company. The sole member of Landon is a trust established under the nation of Jersey (not to be confused with the state of New Jersey).

only required to make a prima facie showing of the facts on which jurisdiction is predicated. *Id.* And the court must accept as true the plaintiff's uncontroverted allegations and resolve all factual conflicts in the plaintiff's favor. *Id.*

In a diversity action such as this, a federal court may exercise personal jurisdiction over a defendant to the extent permitted by the applicable law of the forum state. *Cent. Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 380 (5th Cir. 2003). "[T]he Texas long-arm statute authorizes the exercise of personal jurisdiction to the full extent allowed by the Due Process Clause of the Fourteenth Amendment." *Id.* (citing Tex. Civ. Prac. & Rem. Code Ann. § 17.042). Thus, Texas due process requires a plaintiff to prove: "(1) that the defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice." *Id.* at 380 (quoting *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir. 1999)).

To establish specific jurisdiction, the plaintiff must show that the nonresident defendant has "purposefully directed [its] activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal citation and quotations omitted). "A single act by the defendant directed at the forum state, therefore, can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 419 (5th Cir. 1993). But contracting alone with a party located in the forum state is not automatically enough to establish sufficient minimum contacts. *Burger King*, 471 U.S. at 478–79. A contract is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Id.* at 479 (internal quotations

and citation omitted). The court must analyze prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing, to determine "whether the defendant purposefully established minimum contacts within the forum." *Id.* Refusal to make contractually required payments can cause "foreseeable injuries" in the forum state, making it "presumptively reasonable . . . to be called to account there for such injuries." *Id.* at 480. A defendant purposefully directs its activities "at a resident of the forum . . . with the aim of establishing long-term association with that resident and with the foreseeable and intended result of causing economic activity within the forum state." *Cent. Freight Lines*, 322 F.3d at 383.

Here, Landon reached out to Ancor in Texas regarding the ICON transaction, solicited and negotiated with a Texas resident, entered into a contract with a Texas resident that called for performance and contemplated future contracts in Texas, and physically came to Texas as part of the performance on that agreement. *See id.*; *Burger King*, 471 U.S. at 479. And, resolving factual conflicts in favor of Ancor, Landon failed to make the payments required under the Landon LOI, causing injury to Ancor in Texas. *See Burger King*, 471 U.S. at 480. Based on these allegations, Ancor has pled facts that are sufficient to show that Landon purposefully availed itself in Texas in connection with the breach of contract claim. Moreover, the exercise of jurisdiction is fair and reasonable.[7] *See id.* at 477 (discussing

---

[7] Landon does not raise in its brief that the assertion of jurisdiction over this case is unfair and unreasonable. *See Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999) ("Once a plaintiff has established minimum contacts, the burden shifts to the defendant to show the assertion of jurisdiction would be unfair."). While there would be a burden on the defendant to litigate in Texas, the forum state's interest in the lawsuit, Ancor's interests in convenient and effective relief, and the judicial system's interest in efficient resolution of the controversy, coupled with the state of Texas's interest in furthering social policies, outweighs any burden on Landon. *Cent. Freight Lines*, 322 F.3d

factors to "determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice'"); *see also Cent. Freight Lines*, 322 F.3d at 384. Jurisdiction lies in this court.

## III.

### Declaratory Judgment

Ancor argues on appeal that the declaratory judgment claim against Landon should have been submitted to the jury.[8] Whether a litigant has a right to a jury trial is a legal question that this court reviews *de novo*. *United States v. ERR, LLC*, 35 F.4th 405, 409 (5th Cir. 2022).

The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." The Supreme Court has interpreted "Suits at common law" as referring to "suits in which *legal* rights are to be ascertained and determined" as opposed to "equitable rights." *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 564 (1990) (cleaned up). To determine whether a particular action will resolve legal rights, the court applies a two-part test: "First, [the court] compare[s] the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, [the court] examine[s] the remedy sought and determine[s] whether it is legal or equitable in nature." *Id.*

---

at 384. We therefore hold that that the exercise of jurisdiction over Landon does not offend traditional notions of fair play and substantial justice. *See id.* at 385.

[8] ICON argues that Ancor waived or abandoned the declaratory judgment claim against it because Ancor did not raise the claim on appeal. *See Stem v. Gomez*, 813 F.3d 205, 214 (5th Cir. 2016) (citation omitted). In response, Ancor explains that the claim against ICON is not currently appealable because it arises from ICON's tortious interference with the Landon LOI. Liberally construing Ancor's briefs, we hold that the declaratory judgment claim against ICON has not been waived. *See, e.g.*, *SEC v. Recile*, 10 F.3d 1093, 1096 (5th Cir. 1993).

(internal quotations and citation omitted). "The second inquiry is . . . more important in [the court's] analysis." *Id.*

Declaratory judgments were unknown at the time the early Republic adopted the Seventh Amendment. *See* 10B Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2769 (4th ed.). Courts therefore look for an analogous cause of action that would have existed in the 18th century to determine whether the nature of a declaratory judgment action is legal or equitable. *Terry*, 494 U.S. at 566; *see also Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 284 (1988) ("[C]ourts have therefore had to look to the kind of action that would have been brought had Congress not provided the declaratory judgment remedy."). Ancor claims that the declaratory judgment claim implicated an issue of contract construction. In support, Ancor cites the Supreme Court's holding in *Simler v. Conner*, 372 U.S. 221 (1963) (per curiam), and the Third Circuit decision in *AstenJohnson, Inc. v. Columbia Casualty Co.*, 562 F.3d 213 (3d Cir. 2009). Landon focuses on the second *Terry* factor, framing Ancor's actions as an "equitable lien" on potential future sale proceeds.

In *Simler*, the Supreme Court determined that a declaratory judgment claim which sought to determine the amount of fees owed to a lawyer under a contingent fee agreement was a "traditionally 'legal' action" that entitled the petitioner to a jury trial. 372 U.S. at 223. And, in *AstenJohnson*, the Third Circuit deemed a declaratory judgment that sought to obligate two insurance companies to indemnify the appellant for "all judgments or settlements reached" in a lawsuit as a legal claim that should be submitted to the jury, as long as there were no special circumstances "which indicate that a suit on the contract is likely to be inadequate when it is available." 562 F.3d at 219, 224–26. The declaratory judgment sought by the plaintiff in *AstenJohnson* was "based on a contract" and "filed in anticipation of harm but before harm [had] been suffered," and had "an adequate remedy at law." *Id.* at 235–26.

As applied to this case, the declaratory relief Ancor seeks would establish the existence of a contractually based payment that will arise upon an event to occur in the future, which could lead to money damages under a breach of contract action.[9] "[I]t would be difficult to conceive of an action of a more traditionally legal character" than an action for amounts due under a contract. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477 (1962) (citing *Scott v. Neely*, 140 U.S. 106, 110 (1891)). We are persuaded that Ancor's declaratory judgment claim is legal in nature. Moreover, the declaratory judgment claim would have an adequate remedy at law. *See Terry*, 494 U.S. at 565; *see also AstenJohnson*, 562 F.3d at 224–25.

Landon contends that the claim is an "equitable lien" on potential future sale proceeds. An equitable lien is defined as "a right, that is not recognized at law, to have a fund or specific property, or its proceeds, applied in whole or in part to the payment of a particular debt or class of debts." Barbara J. Van Arsdale, 51 Am. Jur. 2d Liens § 30 (May 2024). It "is a remedy that resembles the constructive trust, but instead of giving the plaintiff title (or an equitable interest in title), an equitable lien will give the plaintiff a security interest in the property in question." Samuel L. Bray, *The System of Equitable Remedies*, 63 UCLA L. Rev. 530, 554–55 (Mar. 2016). Typically, "an equitable lien is impressed to reflect an express agreement that the property to be liened was intended to be held as security for the

---

[9] Ancor cites multiple state court decisions that construe legal rights under a contract as an action at law. *See, e.g.*, *Ex parte Bennett*, 622 So. 2d 1307, 1309 (Ala. 1993) ("An action seeking a declaration of rights under a contract . . . is essentially legal in nature."); *Union Ins. Co. v. Bailey*, 450 N.W.2d 661, 664 (Neb. 1990) (holding that the "essence of the dispute" sounded in contract based on caselaw questioning "whether such an action is to be treated as one at law or one in equity is to be determined by the nature of the dispute"); *Middleton v. Eubank*, 694 S.E.2d 31, 34 (S.C. Ct. App. 2010) (stating that "an action to construe a contract is an action at law"). While not binding on this court, we find these cases helpful in defining the legal nature of Ancor's claim.

obligation of the promisor." *Branca v. Branca*, 443 A.2d 929, 931 (Del. 1982). Landon contends that if the new company were to be sold, Ancor would be left to file a separate suit against the new company's sellers to enforce the lien on the sale proceeds. We disagree with Landon's overall characterization.

Section 8(c) of the Landon LOI states that "Landon shall not . . . enter into any agreement or transaction (including the Transaction) with [ICON] at any time unless it shall have obtained the prior written consent of Ancor and simultaneously provided Ancor all of the payments, reimbursements and/or *other consideration* provided for in this Agreement, including Section 9 below." (emphasis added). Ancor's chief argument at trial was that because Landon closed on its own transaction with ICON in December 2020 but failed to provide Ancor with any of the contractually agreed payments, reimbursements, or "other consideration"—i.e., a commitment it would pay the Promote Interest—Ancor filed a lawsuit against Landon for breach of contract. Paired with the breach of contract claim was a claim for declaratory judgment, seeking a declaration that Ancor would be owed its Promote Interest upon a subsequent sale or recapitalization of ICON pursuant to Section 8(c) of the Landon LOI. Ancor labels this as a "condition precedent" to payment of the Promote Interest. We agree with Ancor. There is neither language expressing that the Promote Interest was to be held as security for Landon's obligations nor does Ancor's claim seek a security interest in property currently, or even guaranteed to later be, in Landon's possession. Caselaw suggests that declaratory judgments "based on a contract" that are "filed in anticipation of harm but before harm [had] been suffered" are legal claims. *AstenJohnson*, 562 F.3d at 226; *see also Simler*, 372 U.S. at 223. Ancor's declaratory judgment claim is one of contract interpretation, and the claim would have an adequate remedy at law, that is, money damages under a breach of contract action. *See Terry*, 494 U.S. at 570; *AstenJohnson*, 562 F.3d at 226.

No. 23-10552

Accordingly, because the declaratory judgment claim is legal in nature, Ancor is entitled to a jury trial on its claim against both Landon and ICON. The court hereby reverses and remands this claim to be submitted to a jury.

## IV.

### Tortious Interference

Ancor next argues on appeal that the trial court erred in granting judgment as a matter of law for ICON on the tortious interference with a contract claim.[10] This court reviews a trial court's grant of judgment as a matter of law *de novo*, applying the same legal standard as the trial court. *MultiPlan, Inc. v. Holland*, 937 F.3d 487, 494 (5th Cir. 2019).

On review, this court considers the evidence in the light most favorable to the nonmovant, drawing all factual inferences in favor of the nonmoving party. *Hurst v. Lee County*, 764 F.3d 480, 483 (5th Cir. 2014). When a trial court considers a motion for judgment as a matter of law, the court may only grant the motion if the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion. *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 777–78 (5th Cir. 2017). A mere scintilla of evidence is not sufficient to present a jury question; rather, there must be a conflict in substantial evidence. *Mack v. Newton*, 737 F.2d 1343, 1351 (5th Cir. 1984). The trial court may not make credibility determinations or weigh the evidence. *Cristain v. Hunter Bldgs. & Mfg., L.P.*, 908 F.3d 962, 964 (5th Cir. 2018).

---

[10] The parties assume, and the court applies, Texas law to the tortious interference with a contract claim. *See Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 705 (5th Cir. 1999).

Ancor's claim against ICON for tortious interference with a contract is governed by Texas law. In Texas, to prove tortious interference with a contract, a plaintiff must show "(1) the existence of a valid contract subject to interference; (2) that the defendant willfully and intentionally interfered with the contract; (3) that the interference proximately caused the plaintiff's injury; and (4) that the plaintiff incurred actual damage or loss." *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017). ICON acknowledges evidence of the first and last element; thus, the focus is on the second and third elements.

## A.

### Willful and Intentional Interference

To show tortious interference with a contract, a plaintiff must show that the defendant willfully and intentionally interfered with the contract in question. *Hansen*, 525 S.W.3d at 689. The plaintiff must produce some evidence showing that the defendant knowingly induced one of the contracting parties to breach its obligations under the contract. *Cuba v. Pylant*, 814 F.3d 701, 717 (5th Cir. 2016) (citing *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 532 (Tex. App.—Fort Worth 2009, pet. denied)). The defendant must have actual knowledge of the contract in question, or knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the contract. *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 490 (5th Cir. 2008) (citing *Steinmetz & Assocs., Inc. v. Crow*, 700 S.W.2d 276, 277–78 (Tex. App.—San Antonio 1985, writ ref'd n.r.e)). The plaintiff is not required to prove the defendant's intent to injure, only that the defendant "desires to cause the consequences of his act" or "believes that the consequences are substantially certain to result from it." *Id.* (quoting *Sw. Bell. Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992)). A plaintiff can prove its case with

circumstantial evidence. *Fan Expo, LLC v. NFL*, No. 05-17-01304-CV, 2019 WL 2211084, at *4 (Tex. App.—Dallas 2019, pet. denied).

At trial, Sullivan (Landon) testified that Williams (ICON) directed him to hide their communications from Keene (Ancor). Up to that point, Ancor had shared all of its due diligence with Landon, including communications between ICON and Ancor. And Keene had contacted Sullivan to get the deal back on track. But Sullivan had planned to meet Williams in North Carolina in the beginning of August, as opposed to meeting Keene in Florida about the deal. On August 12 and 13, Williams and Sullivan communicated five more times by phone. Keene was not made aware of any of these communications, or the meeting. Steven Gianfilippo, ICON's CFO, also spoke to Sullivan two more times on August 13. Then, on August 13, ICON's counsel drafted a letter terminating the transaction with Ancor. Landon then sent ICON a five-page memorandum of understanding ("MOU") that contained the eventual deal's essential terms.

During August, September, and the early part of October 2020, Williams and Sullivan continued to "lie" to Keene. Keene testified that Williams explained to Keene that he may still had been willing to do the deal with Ancor, as discussed during a conversation on September 15, even though Landon and ICON had entered into a MOU a few days prior on September 9. In October, when Keene learned that ICON and Landon had entered the transaction without Ancor, Keene reminded Sullivan of Landon's obligations under the Landon LOI. Keene again reminded Sullivan of Landon's obligations in December. Gianfilippo had texted Williams three days prior to closing the Landon-ICON transaction asking whether Ancor had released its claims against Landon. Sullivan responded that Ancor had not and, referring to Keene, added, "F--- him!" Sullivan testified that Landon asked Ancor to sign a release prior to the closing of Landon's deal with ICON because Landon was "trying to protect from getting sued."

No. 23-10552

On December 4, 2020, Keene emailed Sullivan and reminded him that "Landon Capital is under a contractual obligation not to do this transaction without Ancor unless Ancor specifically consents." Keene also specified the amounts that Landon would owe Ancor under the Landon LOI if it closed on its own deal. Sullivan forwarded Keene's email to Gianfilippo, in which Gianfilippo replied, "I'm not sure how Ancor can claim 5% of ebitda etc when 10mil was used to buy shares direct from shareholders. This has nothing to do with ICON. It's a completely different deal. They also did a bait and switch on control of the company." ICON and Landon closed the deal.

In light of the evidence presented at trial, a reasonable jury could find that ICON intentionally interfered with the Landon LOI. *See SEC*, 854 F.3d at 777–78. Sufficient evidence was introduced that ICON induced Landon to breach its obligations under the contract by encouraging Landon to hide communications and lie about its meetings with ICON, and then begin negotiations at ICON's behest. During this time period, Williams gave the impression to Keene that the original Ancor-ICON-Landon deal was still possible. Yet, Williams coordinated with Sullivan on what to tell Ancor regarding ICON's negotiations with Landon. Gianfilippo even messaged Sullivan whether Landon had successfully secured a release from Ancor three days prior to the closing. And, one day prior to closing, Sullivan forwarded to Gianfilippo an email chain between himself and Keene, discussing Landon's contractual obligations under Section 8(c) of the Landon LOI. Gianfilippo replied to that email that the Ancor-ICON deal was a "completely different deal." On the day of closing, Landon did not obtain Ancor's consent and failed to provide Ancor with any compensation. In the light most favorable to Ancor, there was substantial evidence necessary to overcome judgment as a matter of law on this claim.

19

No. 23-10552

## B.

## Proximate Cause

The third element of tortious interference with a contract is that the defendant's interference proximately caused the plaintiff's injury. *Hansen*, 525 S.W.3d at 689. To establish proximate cause, a party must show that the defendant took an active part in persuading a party to a contract to breach it. *Amigo Broad., LP*, 521 F.3d at 493. The interference claim requires proof that "(1) the act was a substantial factor in bringing about the harm at issue, and (2) absent the act ("but for" the act), the harm would not have occurred." *HMC Hotel Props. II Ltd. P'ship v. Keystone-Texas Prop. Holding Corp.*, 439 S.W.3d 910, 913 (Tex. 2014). Mere conjecture, guess, or speculation is insufficient to establish proximate cause. *Id.* But evidence constituting "more than a mere scintilla" is sufficient to prevent judgment as a matter of law. *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

Ancor claims that, in addition to hiding negotiations between ICON and Landon, ICON encouraged Landon's breach of the Landon LOI by challenging Ancor's entitlements under the contract to Landon. Ancor is referring to the email chain from Keene to Sullivan, which was forwarded to Gianfilippo. In response, ICON argues that neither of the points raised by Ancor are sufficient evidence that would allow a reasonable jury to find proximate cause. ICON relies on the Texas Supreme Court's decision in *HMC Hotel Properties*, 439 S.W.3d 910 (Tex. 2014).

In *HMC*, the plaintiff obtained a jury verdict finding that the defendant's letter declining to waive certain rights under its lease and accusing the plaintiff of violating the lease amounted to tortious interference. 439 S.W.2d at 912. The Texas Supreme Court reversed, holding that there was no evidence that the outcome (death of the sale) would have been

20

different absent the defendant's letter, mainly because the title insurer declined to issue a policy on the property irrespective of the tenant's letter. *Id.* at 915. The court stated, "[t]he deal failed not because of a letter, but because Keystone was unable to convince [the defendant] to voluntarily relinquish its rights . . . . [The defendant's] change of heart may have come as a surprise, but no evidence demonstrates that the title insurers would have been more inclined to abandon their consistent waiver demand if [the defendant] had behaved differently." *Id.* at 916.

The facts of *HMC* differ from the case at hand. Here, unlike the tenant in *HMC*, ICON engaged in extensive secret communications and met with Landon without Ancor's knowledge. The interactions and communications between ICON and Landon, as discussed extensively *supra*, create more than a "mere scintilla of evidence" to prevent judgment as a matter of law. *Arismendez*, 493 F.3d at 606. Thus, we reverse the district court's judgment so the matter can be tried before a jury.

## C.

### Legal Defenses to Tortious Interference

ICON raises numerous defenses, none of which apply in this case. First, ICON argues that it was not a stranger to the Landon LOI and thus could not have tortiously interfered with the Landon LOI as a matter of law. Texas law requires that "a person must be a stranger to a contract to tortiously interfere with it, hence, a contracting party's agent or employee acting in the party's interests cannot interfere with the party's contract." *Morgan Stanley & Co., Inc. v. Tex. Oil Co.*, 958 S.W.2d 178, 179 (Tex. 1997) (citing *Holloway v. Skinner*, 898 S.W.2d 793, 794–95 (Tex. 1995)). Even when a defendant is not a signatory to a contract, there is no tortious interference where the defendant nevertheless has clear connections with the contract. *In re Vesta Ins. Grp.*, 192 S.W.3d 759, 761–62 (Tex. 2006); *see also Guardian Life*

*Ins. Co. v. Kinder*, 663 F. Supp. 2d 544, 557 (S.D. Tex. 2009). This "not a stranger" defense arises from the principle that a party cannot interfere with its own contracts. *Holloway*, 989 S.W.2d at 796. The defense generally applies to those who have an agency relationship with the contracting party. *Morgan Stanley*, 958 S.W.2d at 179.

Ancor claims that two cases relied on by ICON in its "not a stranger" defense—*Morgan Stanley* and *Guardian*—involved agents to a contracting party who could not be held liable for interfering with its principal's contracts, and vice versa. *Morgan Stanley* concerned a sales agent's purported interference with his employer's contract. 958 S.W.2d at 178. There, the Texas Supreme Court heavily relied on its prior decision in *Holloway v. Skinner*, 898 S.W.2d at 794–95, which also dealt with tortious interference in the context of an agency relationship. *Morgan Stanley*, 958 S.W.2d at 178–79. Likewise, the Southern District of Texas's decision in *Guardian* involved an insurance company's alleged interference with a contract entered into by its own general agent. 663 F. Supp. 2d at 550–51, 556–57. Ancor contends that, unlike these cases, ICON is neither a party to the Landon LOI nor has ICON ever asserted that it had an agency relationship with Landon at the time the contract was executed.

Texas jurisprudence supports Ancor's arguments as it pertains to the facts of this case. There is no caselaw to support the contention that a party that is "the very subject" of a contract cannot tortiously interfere with it as a matter of law. *See Holloway*, 898 S.W.2d at 794–95 ("Texas jurisprudence has long recognized that a party to a contract has a cause of action for tortious interference against any third person (a stranger to the contract) who wrongly induces another contracting party to breach the contract."). ICON's not a "stranger" defense thus fails.

No. 23-10552

Second, ICON argues that, even if this court determines that evidence establishes ICON's tortious interference with the Landon LOI, ICON's interference was legally justified. Moreover, ICON claims that it was privileged to interfere with the Landon LOI due to a superior financial interest in the contract. Justification is an affirmative defense to tortious interference with a contract. *Prudential Ins. Co. of Am. v. Fin. Rev. Servs. Inc.*, 29 S.W.3d 74, 80 (Tex. 2000). Under this defense, "one is privileged to interfere with another's contract (1) if it is done in a bona fide exercise of his own rights, or (2) if he has an equal or superior right in the subject matter to that of the other party." *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 691 (Tex. 1989). The defendant bears the burden of proof. *Id.* at 690. Here, ICON's tortious interference arises from Landon's failure to fulfill contractual obligations to Ancor. ICON does not have a greater right than Ancor. And, regarding privilege, ICON does not have a superior financial interest in the contractual provisions at issue. Both defenses fail.

\*     \*     \*

For the foregoing reasons, the trial court's grant of judgment as a matter of law to ICON on Ancor's tortious interference claim is reversed and remanded to be submitted to a jury.

## V.

### Breach of Contract

Landon argues on cross-appeal that it was entitled to judgment as a matter of law on Ancor's breach of contract claim because (A.) Section 8(c) was unambiguously tied to the Due Diligence Period and (B.) no reasonable jury could have concluded that Landon breached Section 8(c) of the Landon LOI. We affirm.

23

## A.

## Ambiguous Contract

Landon first argues that the trial court erred in determining that Section 8(c) was ambiguous. This court reviews *de novo* a finding that a contract is ambiguous. *In re Isbell Records, Inc.*, 586 F.3d 334, 336 (5th Cir. 2009). As provided in the Landon LOI, Section 8 is governed by Delaware law. When interpreting a contract, Delaware courts "give effect to the intent of the parties." *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023). "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party." *Id.* (emphasis removed) (internal quotations and citation omitted). A contract should be read as a whole. *Id.* Clear and unambiguous language should be enforced according to its plain meaning. *Id.* "Language is ambiguous if it is susceptible to more than one reasonable interpretation. An interpretation is unreasonable if it produces an absurd result or a result that no reasonable person would have accepted when entering the contract." *Id.* (footnote and internal quotation omitted).

Here, Section 8's introductory paragraph states that Landon and Ancor agreed not to "enter into any transaction" with ICON without the participation of the other "on the terms as set forth herein until the expiration of the Due Diligence Period." During the Due Diligence Period, the parties were to "work jointly" toward the consummation of the Transaction with ICON and, "without the prior written consent" of the other party, "not knowingly circumvent, avoid, bypass or eliminate the other's interest in pursuit of such proposed Transaction." In Section 8(a), if Landon were to pull out of the Transaction, Ancor (not Landon) would be free to pursue the ICON transaction. Under Section 8(b), "at the conclusion of the Due Diligence Period," Ancor (not Landon) would be free to pursue

the ICON transaction with other equity investors. Finally, Section 8(c) states that, "[n]otwithbited the foregoing," Landon was prohibited from entering into "any agreement or transaction (including the Transaction)" at any time unless it had "prior written consent" from Ancor and has provided Ancor "all of the payments, reimbursements and/or other consideration" provided for in the agreement. Section 11 states that this Section 8 would "survive the termination" of the Landon LOI.

Reviewing the plain language of the contract, the trial court did not erroneously determine that the contract was ambiguous. The language of Section 8(c) was likely meant to prohibit Landon from circumventing Ancor and doing a transaction with ICON to the exclusion of Ancor. Keene testified that nobody would have agreed to a deal that did not prohibit that. But Landon claims that nobody would have agreed to an "unrestricted veto right" and that Keene himself testified that "at any time" did not mean "in perpetuity." It would be "unreasonable" to view the contract as unambiguous under Landon's interpretation. The trial court was correct to rule that this provision was ambiguous and should be submitted to the jury.

**B.**

**Jury's Finding Supported by Evidence**

Landon next argues that the jury's finding that Landon and Ancor "mutually intended" that Section 8(c) would constitute a binding prohibition beyond the Due Diligence Period was contrary to undisputed evidence. The determination of a party's intent through extrinsic evidence is a question of fact. *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 458–59 (5th Cir. 1995). A jury's findings of fact on the contracting party's intent are examined on appeal for sufficiency of the evidence. *Id.* Here, Landon's argument hinges on Keene's testimony that he "didn't mean to interpret [Section 8(c)] for infinity." In response, Ancor argues that the question for

the jury was whether Section 8(c) extended beyond the expiration of the Due Diligence Period, which the jury answered "yes." We agree that the jury was able to review the language of Section 8 and heard Keene's testimony that Landon's obligations under Section 8(c) were intended to survive the Due Diligence Period. Keene's testimony that the Due Diligence Period was not meant to last for "infinity" does not affect this outcome. The jury's verdict was supported by evidence.

\* \* \*

For these reasons, the trial court did not err in submitting the breach of contract claim to the jury, nor did the jury err in its findings.

## VI.

## Damages

The issues on appeal concerning the damages awarded at trial include: (A.) whether Ancor was entitled to the fees and reimbursement the jury awarded and (B.) whether the trial court erred in preventing Ancor from introducing evidence regarding a portion of Ancor's damages. We reverse in part.

## A.

## Jury Award

Landon claims there was no evidence for the jury's award of fees of $1.75 million, consisting of the $500,000 closing fee and the five years of management fees at $250,000 per year. Under Delaware law, damages for breach of contract are "measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract." *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1130 (Del. 2015) (footnote omitted).

Ancor is entitled to its management and closing fees. Section 8(c) allows Landon to enter into a transaction with ICON to the exclusion of Ancor only if Landon first obtained Ancor's consent and provided Ancor with "all of the payments, reimbursements and/or other consideration provided for in this Agreement." Section 8(c) made the management and closing fees in Section 3 binding because Landon did not perform its promises. Besides the Promote Interest, there are only three forms of monetary compensation in the Landon LOI: the management fee and closing fee in Section 3, and the reimbursement provision in Section 9. "Payments" likely does not refer to reimbursements under Section 9. The definition of "payments" is the "[p]erformance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation," or it is "[t]he money or other valuable thing so delivered in satisfaction of an obligation." *Payment*, BLACK'S LAW DICTIONARY (12th ed. 2024). The reasonable construction of Section 8(c) is that "payments" refers to the management and closing fees described in Section 3, not the reimbursement in Section 9.

Moreover, Landon challenges the jury award for breach of Section 9. We agree with Landon that the trial court erred in entering 100% of the expenses sought in reimbursements. Section 9 provides two options: one if the deal is consummated or another if the deal is not consummated. The latter calls for Landon to "immediately upon request reimburse Ancor for 80% of all third-party costs incurred." At oral argument, Ancor stated that it was "only initially claiming 80% but in those demand letters that we sent them before [ICON and Landon] closed, we were saying pay us a 100% because we don't want to go back and lie to our vendors," which Ancor had given discounts. Oral Argument at 15:25–33. The reference to "reimbursements" in Section 8(c) is tied to Section 9. And Section 9 provides reimbursement to Ancor for "80% of all third-party costs incurred"

if the deal is not consummated. According to the agreement, the final judgment should be reduced to reflect the "80% of all third-party costs incurred."

## B.

### Evidence of a Portion of Ancor's Damages

Last, Ancor argues that the trial court erred in preventing it from introducing evidence regarding a portion of Ancor's damages. Specifically, the Landon LOI contemplates an annual management fee "equal to the greater of 5% of EBITDA or $250,000." Ancor sought to introduce evidence of the "5% of EBITDA." The defendants argue that the damage amounts and the methodology for calculating this amount had never been disclosed.

This court reviews a trial court's decision to exclude evidence pursuant to Rule 37(c) of the Federal Rules of Civil Procedure for an abuse of discretion. *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 277 (5th Cir. 2009). Rule 26(a)(1)(A)(iii) requires a disclosure of "a computation of each category of damages claimed by the disclosing party." Rule 37(c) mandates the exclusion of information not properly disclosed in a party's Rule 26 disclosures unless the failure to disclose was substantially justified or harmless. We hold that Ancor's failure to disclose meets neither exception.

First, the failure to disclose was not substantially justified. Ancor points to its complaint and first amended complaint, its motion to compel, its trial brief, and other documents wherein Landon acknowledged Ancor's position that it was owed a management fee of "5% of EBITDA." Yet each of these documents referenced above refer to the blanket "5% of EBITDA," and do not describe the calculation of the EBITDA amount further. Moreover, the exact language under the contract provided for "the greater of 5% of EBITDA or $250,000," the latter having been awarded in this case. In the alternative, Ancor argues that its failure to disclose the precise dollar

amount of its management fee damages was substantially justified by the defendants' improper delay in producing documents to compute such amount. The record reflects that any delay in producing documents was that of Ancor.

Ancor first requested ICON's financial statements on June 18, 2021, and provided a second request on January 10, 2022, which included a request for certain financials at issue here. On February 9, 2022, Landon responded to the second request for production at issue. For the next four months, Landon and Ancor conferred regarding the objections to the production of financials. Ancor then filed its motion to compel three months later within the ninety-day time period before trial. Landon claimed that the motion to compel was untimely. The trial court nonetheless granted Ancor's motions and ordered Landon and ICON to produce certain documents eleven days later, on November 4, 2022. Landon and ICON complied. Landon now claims that Ancor received the documents over a month before trial but did not disclose any new damage computation. Ancor's response on appeal is that, "[g]iven this level of pretrial activity, Ancor's failure to disclose its computations and/or supplement its damage disclosures is hardly surprising." Based on the foregoing, we hold that Ancor's failure to disclose computations was not substantially justified.

Second, the failure to disclose was not harmless. The court considers four factors in evaluating whether a violation of Rule 26 was harmless: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Texas A&M Rsch. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003).

Ancor notes that the importance of the management fee evidence "cannot be overstated." At trial, Ancor sought to offer proof that the EBITDA-based calculations were nearly seven times higher than the minimum management fee of $250,000. Yet the record reflects that Keene would have been making estimations of ICON's EBITDA based on profit and loss statements. As applied to the facts here, Ancor's failure to disclose was not harmless. Ancor was transparent with the percentage of EBITDA that would be calculated in determining the management fee, but failed to disclose the computation method it would use at trial to prove this fee. Ancor's reason for failing to disclose the method was due to its "pretrial activity." Such a failure to disclose is not harmless.

\* \* \*

For the stated reasons, the court hereby affirms the final judgment as it pertains to the management fee and closing fee, and reverses in part for the trial court to determine "80% of all third-party costs incurred."

## VII.

## Conclusion

We REVERSE the trial court's grant of judgment as a matter of law to Landon on Ancor's declaratory judgment claim and judgment as a matter of law to ICON on Ancor's declaratory judgment claim and tortious interference claim, and REMAND to have these claims tried before a jury. The trial court's denial of judgment as a matter of law to Landon on Ancor's breach of contract claim is AFFIRMED. We further REVERSE in part the final judgment entered by the trial court and REMAND with instructions as set forth herein.